**Slip Op. 03-41**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: SENIOR JUDGE NICHOLAS TSOUCALAS**

_____
                                        :
LUOYANG BEARING FACTORY,                :
                                        :
       Plaintiff and              :
       Defendant-Intervenor,      :
                                        :
       v.                         :    Consol. Court No.
                                        :    99-12-00743
UNITED STATES,                          :
                                        :
       Defendant,                 :
                                        :
       and                        :
                                        :
THE TIMKEN COMPANY,                     :
                                        :
       Defendant-Intervenor       :
       and Plaintiff.             :
_____:


[Commerce's Remand Results are affirmed in part, remanded in part.]



    Hume & Associates, PC (Robert T. Hume and Stephen M. De Luca) for Luoyang, plaintiff and defendant-intervenor.

    Robert D. McCallum, Jr., Assistant Attorney General; David M. Cohen, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (Lucius B. Lau); Susan H. Kuhbach, Acting Assistant Secretary for Import Administration, Elizabeth C. Seastrum, Senior Counsel, and Rina Goldenberg, of counsel, Office of the Chief Counsel for Import Administration, United States Department of Commerce, for the United States, defendant.

    Stewart and Stewart (Terence P. Stewart, Geert De Prest, Wesley K. Caine, Amy S. Dwyer and Amy A. Karpel) for Timken, defendant-intervenor and plaintiff.

Dated: April 14, 2003

**OPINION**

**I.   Standard of Review**

The Court will uphold Commerce's redetermination pursuant to the Court's remand unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i) (1994).  Substantial evidence is "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Universal Camera Corp. v. NLRB, 340 U.S. 474, 477 (1951) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Substantial evidence "is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Comm'n, 383 U.S. 607, 620 (1966).

**II.   Background**

On October 1, 2002, this Court issued an opinion and order directing the United States Department of Commerce, International Trade Administration ("Commerce"), to:

> (1)   (a) examine whether or not the PRC trading company import prices constitute the "best available information" to value either all of the subject merchandise at issue or a portion of the subject merchandise purchased by Luoyang through the trading company and used

by Luoyang in the manufacture of TRB cups and cones and, if Commerce concludes that the PRC trading company import prices present the "best available information" for the purpose of such surrogate evaluation, to recalculate Commerce's determination not inconsistent with this opinion; and

(b) examine if, and only if, Commerce finds that the PRC trading company import prices do not constitute the "best available information," whether or not Indonesian data (that is, Indonesian import statistics and export data from Japan to Indonesia) constitute the "best available information" over export data from Japan to India to value the bearing quality steel bar used in the production of TRB cups and cones, and to explain, (if Commerce finds that export data from Japan to India is the "best available information,") how the entire export data from Japan to India falls within the range of values in the United States category benchmark range;

(2) exclude "consumption of traded goods" from Commerce's overhead, SG&A and profit rate calculations and to recalculate the dumping margins accordingly; and

(3) (a) explain, with reference to the record, whether or not the PRC bearing producer's import data at issue was "meaningful"; and

(b) provide the Court with an explanation as to why the PRC trading company data is not the "best available information" for the purpose of valuing either the entire FOP (that is, both the directly imported FOP and the NME sourced FOP) or the NME sourced FOP.

Luoyang Bearing Factory v. United States, 2002 Ct. Intl. Trade LEXIS 117, at *108-09, Slip Op. 02-118 (Oct. 1, 2002).

On December 31, 2002, Commerce submitted its Final Results of Redetermination Pursuant to Court Remand ("Remand Results").[1] On January 27, 2003, Luoyang submitted comments to this Court regarding the Remand Results. See Comments on Final Results Pursuant to Remand ("Luoyang's Comments"). Subsequently, Timken submitted a rebuttal to Luoyang's comments and Commerce filed a response to Luoyang's comments.

## III. Contentions of the Parties

### 1.   Luoyang's Contentions

Luoyang limits its comments to Commerce's decision to use export data from Japan to India to value bearing quality steel bar used by Luoyang to manufacture tapered roller bearing ("TRB") cups and cones[2] and asserts that Commerce's Remand Results do not satisfy the Court's remand order on this issue. See Luoyang's

---

[1] Luoyang was the only party to submit comments on the draft results issued by Commerce on December 3, 2002. See Remand Results at 2-3.

[2] Luoyang states that:

Luoyang accepts without comment Commerce's treatment in the Remand Results of . . . the exclusion of "consumption of traded goods" from direct input costs . . . [and] whether the quantities of steel Luoyang imported directly to produce cages were "meaningful." Luoyang objects, however, to Commerce's treatment of . . . the selection of the surrogate value for the steel for cups/cones.

Luoyang's Comments at 4-5.

Comments at 2, 4-18.  In particular, Luoyang argues that rather than evaluate whether or not the PRC trading company import prices constitute the "best available information" to value either all of the subject merchandise at issue or a portion of the subject merchandise purchased by Luoyang through the trading company and used by Luoyang in the manufacture of TRB cups and cones, Commerce in the Remand Results, instead offered its "subsidy suspicion" policy which amounts to a post hoc rationalization.[3]  See id. at 5-9.  Luoyang further argues that since the Court in Luoyang Bearing Factory, 2002 Ct. Intl. Trade LEXIS 117, at *95 n.28, refused to add information pertaining to a subsequent review to the record, the Court now should likewise reject Commerce's rationale in the Remand Results because Commerce's rationale constitutes new record evidence.  See Luoyang's Comments at 7 n.20.  Moreover, Luoyang contends that "[b]oth the United States Supreme Court and this Court have categorically rejected consideration of post

---

[3]  Luoyang contends that Commerce's argument amounts to a post hoc rationalization because Commerce in the Final Results of 1997-1998 Antidumping Duty Administrative Review and Final Results of New Shipper Review of Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From the People's Republic of China ("Final Results"), 64 Fed. Reg. 61,837, 61,845 (Nov. 15, 1999), "relied 'solely on {its} policy of not using import prices paid by PRC trading companies[,]'" Luoyang's Comments at 6-7 (quoting Remand Results at 6), whereas in "[t]he Remand Results, . . . [Commerce] presented a new basis for disregarding the trading company prices, namely that 'there is sufficient evidence to believe or suspect that the steel purchased by the PRC trading company could have been subsidized.'" Luoyang's Comments at 7.

hoc rationalizations and arguments which are not on the record. . . . Commerce's 'subsidy suspicion' argument meets both criteria for rejection." Id. at 9 (emphasis omitted); see also id. at 8-9 (citing Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168-69 (1962), and Hoogovens Staal BV v. United States, 22 CIT 139, 143, 4 F. Supp. 2d 1213, 1218 (1998)).

Next, Luoyang argues that Commerce's acknowledgment that the export data from Japan to India value of $871 per metric ton ("MT") does not fall within the United States benchmark range of $642/MT to $834/MT and Commerce's subsequent explanation that "its intention 'was to indicate that the [export data from Japan] to India fell 'within range' of the values in the benchmark range'" (that is, the export data from Japan to India value was reasonable when compared to the values within the benchmark range) amounts to a post hoc rationalization. Luoyang's Comments at 10 (quoting Remand Results at 11); see also Luoyang's Comments at 5. Luoyang further argues that "Commerce failed to give any example in the Remand Results where it applied the 'within range of the range' methodology in any other case." Luoyang's Comments at 10-11.

Additionally, Luoyang contends that "Commerce's preference for a single surrogate country does not trump the statutory requirement to use the 'best available information.'" Id. at 11. In

particular, Luoyang argues that in Luoyang Bearing Factory, 2002
Ct. Intl. Trade LEXIS 117, at *26-27 n.8, "this Court rejected
Commerce's argument that its primary surrogate country preference
overrides the statutory mandate to use the 'best available
information[]'" and "[y]et, this is what Commerce claims in the
Remand Results by asserting again the primacy of its single
surrogate country policy." Id. at 11-12. Luoyang maintains that
in the Remand Results Commerce's only additional argument that is
offered to support Commerce's preference policy "[is] the fact
[that] the policy was discussed in [Commerce's] Antidumping
Manual." Luoyang's Comments at 12.[4]

### 2. Commerce's Contentions

Commerce responds that pursuant to the Court's opinion and
order in Luoyang Bearing Factory, 2002 Ct. Intl. Trade LEXIS 117,
at *46-47, 108, Commerce examined the PRC trading company import
price and found that it did not constitute the "best available

_____

[4]   Luoyang also argues that "Commerce failed to disregard
aberrational data" in the Remand Results. Luoyang's Comments at
16. The Court will not address this argument since it is outside
the scope of this remand redetermination and particularly since
this Court in Luoyang Bearing Factory, 2002 Ct. Intl. Trade LEXIS
117, at *48, held that "the Court disagrees with Luoyang that the
Court should order that Commerce exclude the values for January
1998 and March 1998 from the export data from Japan to India.
Luoyang may not usurp Commerce's role as fact-finder and substitute
Luoyang's analysis for the result reached by Commerce."

information" to value either all of the subject merchandise at issue or a portion of the subject merchandise purchased by Luoyang through the trading company and used by Luoyang in the manufacture of TRB cups and cones because "the steel purchased by Luoyang from the PRC trading company was manufactured in [a certain country] . . . [and] [a]t the time of the . . . <u>Final Results</u>, [64 Fed. Reg. 61,837] there was reason to believe or suspect that [the certain country's] steel was subsidized." <u>Remand Results</u> at 6. Specifically, Commerce points out that "[it] found in [various countervailing duty determinations that the certain country at issue] maintains generally available subsidies that were greater than <u>de minimis</u> [and] . . . based on the existence of generally available subsidies, there is sufficient evidence to believe or suspect that the steel purchased by the PRC trading company <u>could have been subsidized</u>." <u>Id.</u> at 8-9 (emphasis supplied); <u>see also id.</u> at 21. Relying on the Omnibus Trade and Competitiveness Act of 1988, Pub. L. No. 100-418, 102 Stat. 1107 (1988), Commerce maintains that the legislative history states that "'in valuing . . . {nonmarket economy . . .} factors, [Commerce] shall avoid using any prices which it has reason to believe or suspect may be dumped or subsidized prices . . . [and] [Commerce] is not required to conduct a formal investigation to support a finding of 'reason to believe or suspect,' but should instead base its decision on

information that is generally available to it at the time it is making its determination." Remand Results at 6-7; see also id. at 20. Commerce further maintains that Commerce's reference to "general subsidies" in Final Results of Antidumping Administrative Review of Certain Helical Spring Lock Washers From The People's Republic of China, 61 Fed. Reg. 66,255, 66,257 (Dec. 17, 1996), means that "even if the importing surrogate country or NME does not have a subsidies finding, it may be possible to infer that prices of the input in question are subsidized." Remand Results at 8. Commerce, therefore, asserts that "in cases where the facts developed in [United States] or third country countervailing duty findings are sufficient to allow [Commerce] to infer that there are broadly available subsidies, [Commerce] will consider that it has reason to believe or suspect that prices of the input from that country are subsidized." Id.

Next, Commerce concedes that the export data from Japan to India value of $871 per MT "does not fall 'within the range of the values' in the [United States] benchmark category of $642/MT to $834/MT." Remand Results at 10. Commerce points out that in the Final Results, 64 Fed. Reg. 61,837, Commerce "erroneously stated that [Commerce's] examination was focused on whether the potential surrogate values fell 'within the range of the values' . . . in the [United States] benchmark category" and that Commerce's

"intent[ion] was to indicate that the [export data from Japan] to India value fell 'within range' of the values in the benchmark range, i.e., that the [export data from Japan] to India value was reasonable when compared to the values within the benchmark range." Id. at 10-11.  In the Remand Results, Commerce explained the use of Commerce's benchmark range by stating:

> As [Commerce] noted in the [Final Results of Redetermination Pursuant to Court Remand in Timken Co. v. United States, 26 CIT ___, 201 F. Supp. 2d 1316 (2002)], the purpose of a benchmark is to test the reliability of certain values under consideration as surrogate values. For cups and cones, [Commerce] ha[s] repeatedly used [United States] prices as a benchmark because the Harmonized Tariff Schedule of the United States ("HTSUS") category is the only world market HS category of which [Commerce] [is] aware that explicitly contains only bearing quality steel, the type of steel used to manufacture TRBs cups and cones.  By using values from this HTSUS category, [Commerce] [is] able to test whether the broader surrogate country HS categories likely reflect imports of bearing quality steel or whether they likely reflect imports of other types of steel.  The use of the [United States] data for this purpose has been upheld by the [Court of International Trade].
>
>       . . . As long as a surrogate value is reasonably close to the benchmark value or range of benchmark values, [Commerce] will not treat that surrogate value as being aberrational.
>
>       If [Commerce] were to reject certain values simply because they are above or below the benchmark or benchmark range, [Commerce] would, in essence, be saying that any data that is not exactly the same as the benchmark data must be unreliable and abberrational.  In this instance, because the data being utilized as benchmark data is [United States] data, by adopting a policy that all surrogate values outside of the benchmark range are unreliable, [Commerce] would essentially be adopting the United States as a surrogate country.  This

would be contrary to the statute [that is, 19 U.S.C. § 1677b(c)(4) (1994)] because the United States is not comparable to the PRC in terms of economic development.

Remand Results at 11-12 (citations omitted).[5]

Commerce, therefore, maintains that: (1) the average export data from Japan to India value of $871/MT "is reasonable when compared to the range of values in the [United States] benchmark category of $642/MT to $834/MT[,]" id. at 13; (2) export data from Japan to India is the best available information for valuing TRB cups and cones because "the Japanese tariff category is the narrowest category that could contain bearing quality steel and because it is consistent with [Commerce's] benchmark[,]" id.; and (3) export data from Japan to India is the best available information to value TRB cups and cones because "as discussed in [Final Results, 64 Fed. Reg. 61,837], [Commerce] chose India as

---

[5]     Luoyang responds that Commerce "misapplied the [United States] benchmark" because "using a range is not appropriate when comparing Japanese export prices." Luoyang's Comments at 13. In particular, Luoyang asserts that unlike in Timken Co. v. United States, 25 CIT ___, 166 F. Supp. 2d 608 (2001), where "Commerce was using the benchmark to evaluate 'imports' into Indonesia and India[,]" in Final Results, 64 Fed. Reg. 61,837, "Commerce evaluated Japanese export prices in a 'basket category[]' [and, therefore,] [t]he [United States] prices of Japanese 'bearing quality steel' . . . should be compared with Japanese exports to Indonesia and India." Id.; see also id. at 13-14 (citing Ex. 3). Moreover, Luoyang argues that "[i]f Commerce concludes that Japanese exports, rather than Indonesian imports, represent the best 'alternative' surrogate value, then Commerce should select the exports that are consistent with Japanese [bearing quality steel] prices." Luoyang's Comments at 15.

[Commerce's] primary surrogate country and [Commerce] considers the [export data from Japan] to India to be refined Indian data." Id.

Finally, relying on 19 C.F.R. § 351.408(c)(2) (1998) and the Court's discussion of Commerce's Antidumping Manual in Timken Co., 25 CIT at ___, 166 F. Supp. 2d at 621-22, Commerce argues that "[b]ecause [Commerce] ha[s] a reliable surrogate value [that is, export data from Japan to India] from [Commerce's] primary surrogate country, India, and it is [Commerce's] preference to value surrogate values using a single surrogate country whenever possible, [Commerce] need not further examine data from a secondary surrogate country, specifically cups and cones data on Japanese exports to Indonesia." Remand Results at 14; see also id. at 13-14, 22-23.

### 3.    Timken's Contentions

Timken generally agrees with Commerce and maintains that "Commerce fully complied with the Court's remand instructions [and, therefore,] Luoyang's position is without merit and should be rejected." Rebuttal to Plaintiff Luoyang's Comments on Final Results Pursuant to Remand ("Timken's Rebuttal") at 2.

In response to Luoyang's comments regarding Commerce's rejection of the PRC trading company data, Timken argues that: (1)

"Luoyang's contention that Commerce did not evaluate the PRC trading company data is simply incorrect[,]" id. at 5; (2) "Luoyang . . . misapplies the rule on post hoc rationalization to the present circumstances[,]" id. (citing Mitsubishi Heavy Indus., Ltd. v. United States, 24 CIT 275, 281 n.9, 97 F. Supp. 2d 1203, 1209 n.9 (2000), reh'g denied, 112 F. Supp. 2d 1170 (2000), aff'd 275 F.3d 1056, 1066 (Fed. Cir. 2001), and "[u]nder Luoyang's fallacious logic, . . . any explanation Commerce could have given as to what examination of the PRC trading company data revealed would be 'post hoc[,]'" Timken's Rebuttal at 7 (emphasis omitted); (3) Commerce's "subsidy suspicion policy" does not constitute new record evidence because "as Commerce explained in [Commerce's] Remand Results, [Commerce] did not use new information from a subsequent administrative review . . . [but] [r]ather . . . relied on its own countervailing duty determinations (contemporaneous with the underlying TRBs administrative review) regarding the subsidization of steel in the country in question as published in the Federal Register[,]" Timken's Rebuttal at 8 (citing Remand Results at 8-9); and (4) "Commerce's decision on remand not to use the PRC trading company data because [Commerce] had reason to believe or suspect that such data reflected subsidized prices is not 'new policy'" but "[r]ather, Commerce's decision rests on interpretation of its statutory obligation to use the best available information in

valuing factors of production . . . in conjunction with . . . clear legislative history."  Timken's Rebuttal at 8.

Next, Timken maintains that Commerce properly explained its decision to use export data from Japan to India because the Court in <u>Timken Co.</u>, 25 CIT at ___, 166 F. Supp. 2d at 616, noted Commerce's preference for a single surrogate country when it stated:

> Commerce values as many FOPs as possible using information obtained from the "primary" surrogate country, that is, the country that Commerce considers to be most comparable in economic terms to the NME country being investigated, and that also produces merchandise comparable to the subject merchandise. * * * Additionally, if Commerce determines that suitable values cannot be obtained from the data of the primary surrogate country, Commerce resorts to the data from the second, and sometimes the third, surrogate. * * *

Timken's Rebuttal at 9-10 n.4 (emphasis omitted)(quoting <u>Timken Co.</u>, 25 CIT at ___, 166 F. Supp. 2d at 616).

## IV.  Analysis

As a preliminary matter, the Court finds that Commerce's explanation (<u>i.e.</u>, its reason to believe or suspect that the steel purchased by the PRC trading company could have been subsidized) for disregarding the PRC trading company data to value either all of the subject merchandise at issue or a portion of the subject merchandise purchased by Luoyang through the trading company and

used by Luoyang in the manufacture of TRB cups and cones does not amount to a post hoc rationalization.  See Mitsubishi, 24 CIT at 281 n.9, 97 F. Supp. 2d at 1209 n.9 (quoting Motor Vehicle Mfrs. Ass'n v. State Farm, 463 U.S. 29, 50 (1983) ("'[T]he courts may not accept appellate counsel's post hoc rationalizations for agency action. . . .  It is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself'")).  As Timken correctly notes, if Luoyang's argument is taken to its logical conclusion, any explanation offered by Commerce to comply with this Court's opinion and order in Luoyang Bearing Factory, 2002 Ct. Intl. Trade LEXIS 117, at *46-47, 108, would be deemed a form of post hoc rationalization.[6]

---

[6]  The Court also finds that Commerce's acknowledgment that export data from Japan to India was not within the United States benchmark range and Commerce's subsequent explanation that Commerce's intention was to indicate that the export data from Japan to India value (that is, $871 per MT) fell within range of the values in the benchmark range (that is, $642 per MT to $834 per MT) does not amount to a post hoc rationalization.  Moreover, the Court rejects Luoyang's assertion that using a range is not appropriate when comparing Japanese export prices.  In particular, with respect to Luoyang's assertion that "[t]he [United States] prices of Japanese 'bearing quality steel' . . . should be compared with Japanese exports to Indonesia and India[,]" Luoyang's Comments at 13, the Court's "duty is not to weigh the wisdom of, or to resolve any struggle between, competing views of the public interest, but rather to respect legitimate policy choices made by the agency in interpreting and applying the statute." Suramerica de Aleaciones Laminadas, C.A. v. United States, 966 F.2d 660, 665 (Fed. Cir. 1992).

However, the Court remands Commerce's decision to disregard the PRC trading company data to value either all of the subject merchandise at issue or a portion of the subject merchandise purchased by Luoyang through the trading company and used by Luoyang in the manufacture of TRB cups and cones for a different reason.  In particular, the Court finds that Commerce's explanation that the PRC trading company import data did not constitute the "best available information" because "the steel purchased by Luoyang from the PRC trading company was manufactured in [a certain country] . . . [and] [a]t the time of the . . . Final Results, [64 Fed. Reg. 61,837] there was reason to believe or suspect that [the certain country's] steel was subsidized[,]"  Remand Results at 6, is not supported by substantial evidence.  The Court is not satisfied with Commerce's reliance on various countervailing duty determinations to support Commerce's reason to believe or suspect that the steel purchased by the PRC trading company at issue could have been subsidized because the various countervailing duty determinations relied upon by Commerce do not include the hot-rolled bearing quality steel bar, the steel product at issue in this case.  See Luoyang Bearing Factory, 2002 Ct. Intl. Trade LEXIS 117, at *14 n.3.  Although the Court is aware of the Omnibus Trade and Competitiveness Act of 1988's language stating that Commerce shall avoid using any prices which it has reason to believe or

suspect may be subsidized and that Commerce is not required to conduct a formal investigation, the Court remands this case to Commerce to point to specific evidence demonstrating that the type of steel at issue (i.e., hot-rolled bearing quality steel bar) purchased by the PRC trading company was subsidized. See generally China National Machinery Import & Export Corp. v. United States, 2003 WL 648879, at *10 (CIT Feb. 13, 2003) ("[Commerce] must demonstrate particular, specific, and objective evidence to uphold its reason to believe or suspect that the prices [the PRC plaintiff] paid the supplier for the inputs were subsidized").

Next, the Court finds that Commerce failed to examine whether or not Indonesian data (that is, Indonesian import statistics and export data from Japan to Indonesia) constitute the "best available information" over export data from Japan to India to value the bearing quality steel bar used in the production of TRB cups and cones. See Luoyang Bearing Factory, 2002 Ct. Intl. Trade LEXIS 117, at *49-50, 108-09. In the Remand Results, Commerce stated that export data from Japan to India is the best available information to value TRB cups and cones because "as discussed in [Final Results, 64 Fed. Reg. 61,837], [Commerce] chose India as [Commerce's] primary surrogate country and [Commerce] consider[s] the [export data from Japan] to India to be refined Indian data." Remand Results at 13. Additionally, Commerce stated:

Because [Commerce] ha[s] a reliable surrogate value [that is, export data from Japan to India] from [Commerce's] primary surrogate country, India, and it is [Commerce's] preference to value surrogate values using a single surrogate country whenever possible, [Commerce] need not further examine data from a secondary surrogate country, specifically cups and cones data on Japanese exports to Indonesia.

Id. at 14; see also id. at 23 (citing Timken Co., 25 CIT at ___, 166 F. Supp. 2d at 621-22).

In Luoyang Bearing Factory, 2002 Ct. Intl. Trade LEXIS 117, at *26-27 n.8, this Court stated:

The Court shall not entertain Commerce's statement [that is, Commerce's statement that Commerce's regulations give preference to the use of one surrogate country to value all factors of production] since the Court is not aware of any particular preference which trumps the general requirement for precision that underlines the antidumping law. See Timken [Co.], 25 CIT at __, 166 F. Supp. 2d at 621 (stating that "[t]he statute permits Commerce to draw surrogate value information from more than one market economy country," citing 19 U.S.C. § 1677b(c)(1); and quoting Chemical Prods. Corp. v. United States, 10 CIT 700, 706, 650 F. Supp. 178, 182 (1986)(which provides that "'[t]he regulation [relied upon by Commerce] is silent concerning whether Commerce may use data from a country other than its designated surrogate when Commerce finds that a comparison of one element of foreign market value in the surrogate would yield an unrealistic result'").

Moreover, this Court in Luoyang Bearing Factory found that "it was illogical for Commerce to utilize export data from Japan to India and then to subsequently fail to review analogously structured export data from Japan to Indonesia." Luoyang Bearing Factory, 2002 Ct. Intl. Trade LEXIS 117, at *49.

The Court again finds Commerce's reasoning in the Remand Results illogical and unreasonable.  In particular, in the case at bar, Commerce determined that Indian import data (that is, primary surrogate data) was unreliable.  See Luoyang Bearing Factory, 2002 Ct. Intl. Trade LEXIS 117, at *17 (citing Final Results, 64 Fed. Reg. at 61,840).  When Commerce used export data from Japan to India and treated that data as "refined" Indian data, Commerce illogically and unreasonably failed to review Indonesian import statistics and export data from Japan to Indonesia prior to ultimately resorting to export data from Japan to India as the "best available information" in valuing the bearing quality steel bar used to produce the TRB cups and cones at issue.[7]  See Timken Co., 26 CIT at ___, 201 F. Supp. 2d at 1329 ("[T]he Court finds that Commerce's reasoning for rejecting the export data from Japan to India as a surrogate value was not sufficiently explained.  To the contrary, on the basis of the explanation supplied by Commerce one may conclude that it was illogical for Commerce to utilize export data from Japan to Indonesia in order to 'refine' the

_____

[7]  The Court's finding is not inconsistent with Timken Co., 25 CIT at ___, 166 F. Supp. 2d at 621-22.  In Timken Co., the Court stated "[b]ecause the statute [19 U.S.C. § 1677b(c)(4)] and the manual [Commerce's Antidumping Manual] both suggest that Commerce should rely on data from the 'first choice surrogate country' only to the extent possible, it is logical to conclude that, where it is not possible, Commerce is entitled to rely on data from other surrogate countries."  Timken Co., 25 CIT at ___, 166 F. Supp. 2d at 621.

Indonesian data and then to subsequently reject analogously structured export data from Japan to India").

Based on the foregoing, the Court again remands to Commerce, to <u>examine</u> if, and only if, Commerce finds that the PRC trading company import prices did not constitute the "best available information," <u>whether or not Indonesian data (that is, Indonesian import statistics and export data from Japan to Indonesia) constitute the "best available information" over export data from Japan to India to value the bearing quality steel bar used in the production of TRB cups and cones</u>.

## V. Conclusion

The Court remands this case to Commerce to: (a) point to specific evidence demonstrating that the type of steel at issue (<u>i.e.</u>, hot-rolled bearing quality steel bar) purchased by the PRC trading company was subsidized; and (b) examine if, and only if, Commerce finds that the PRC trading company import prices do not constitute the "best available information," whether or not Indonesian data (that is, Indonesian import statistics and export data from Japan to Indonesia) constitute the "best available information" over export data from Japan to India to value the bearing quality steel bar used in the production of TRB cups and cones. The other aspects of Commerce's <u>Remand Results</u> are

uncontested and, upon a review of the results, the Court finds them supported by substantial evidence on the record and in accordance with law.

_____
NICHOLAS TSOUCALAS
SENIOR JUDGE

Dated:     April 14, 2003
           New York, New York