**Slip Op. 03-160**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: SENIOR JUDGE NICHOLAS TSOUCALAS**

————————————————————————————————— :
                                    :
PEER BEARING COMPANY-CHANGSHAN,      :
                                    :
              Plaintiff,            :
                                    :
              v.                    :    Court No.
                                    :    02-00241
UNITED STATES OF AMERICA,            :
                                    :
              Defendant,            :
                                    :
              and                   :
                                    :
THE TIMKEN COMPANY,                  :
                                    :
              Defendant-Intervenor. :
————————————————————————————————— :

Plaintiff, Peer Bearing Company-Changshan ("CPZ"), moves pursuant to USCIT R. 56.2 for judgment upon the agency record challenging the United States Department of Commerce, International Trade Administration's ("Commerce") final determination, entitled Final Results of New Shipper Reviews of Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From the People's Republic of China ("Final Results"), 67 Fed. Reg. 10,665 (Mar. 8, 2002).

Specifically, CPZ contends that Commerce improperly rejected the actual prices paid for steel inputs from its market-economy supplier. CPZ further contends that Commerce's determination that it has reason to believe or suspect that the supplier's prices were subsidized, because there are generally available export subsidies in the supplier's home country, are baseless.

**Held:** CPZ's 56.2 motion is denied. Commerce's final determination is affirmed.

Dated:    December 12, 2003

Hume & Associates, PC (Robert T. Hume) for Peer Bearing Company-Changshan, plaintiff.

Peter D. Keisler, Assistant Attorney General; David M. Cohen, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (David D'Alessandris); of counsel: Glenn R. Butterton, Office of the Chief Counsel for Import Administration, United States Department of Commerce, for the United States, defendant.

Stewart and Stewart (Terence P. Stewart, Wesley K. Caine and Amy A. Karpel) for The Timken Company, defendant-intervenor.

## OPINION

**TSOUCALAS, Senior Judge:** Plaintiff, Peer Bearing Company-Changshan ("CPZ"), moves pursuant to USCIT R. 56.2 for judgment upon the agency record challenging the United States Department of Commerce, International Trade Administration's ("Commerce") final determination, entitled Final Results of New Shipper Reviews of Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From the People's Republic of China ("Final Results"), 67 Fed. Reg. 10,665 (Mar. 8, 2002).

Specifically, CPZ contends that Commerce improperly rejected the actual prices paid for steel inputs from its market-economy supplier. CPZ further contends that Commerce's determination that it has reason to believe or suspect that the supplier's prices were subsidized, because there are generally available export subsidies in the supplier's home country, are baseless.

## BACKGROUND

This case concerns the new shipper reviews of the antidumping duty order on tapered roller bearings ("TRBs") and parts thereof, finished and unfinished, from the People's Republic of China ("PRC") for the period of review covering June 1, 2000, through January 31, 2001. See Final Results, 67 Fed. Reg. at 10,666. On November 29, 2001, Commerce published the preliminary results of the subject review. See Preliminary Results of New Shipper Reviews of Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From the People's Republic of China, 66 Fed. Reg. 59,569. Commerce published the Final Results on March 8, 2002. See Final Results, 67 Fed. Reg. 10,665.

## JURISDICTION

The Court has jurisdiction over this matter pursuant to 19 U.S.C. § 1516a(a) (2000) and 28 U.S.C. § 1581(c) (2000).

## STANDARD OF REVIEW

The Court will uphold Commerce's final determination in an antidumping administrative review unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law . . . ." 19 U.S.C. § 1516a(b)(1)(B)(i) (2000); see NTN Bearing Corp. Oof Am. v. United States, 24 CIT 385, 389-90, 104 F. Supp. 2d 110, 115-16 (2000) (detailing the Court's standard of review for antidumping proceedings).

## DISCUSSION

**I.   Commerce's Determination to Reject Prices Paid by a Non-Market Producer for Steel Inputs from a Market-Economy Supplier**

**A.   Statutory Background**

In conducting a new shipper review, Commerce determines the antidumping margin by taking the difference between the normal value ("NV") and the United States price of the merchandise.  When merchandise is produced in a non-market economy country ("NME"), such as the People's Republic of China ("PRC"), there is a presumption that exports are under the control of the state. Section 1677b(c) of Title 19 of the United States Code provides that, "the valuation of the factors of production shall be based on the best available information regarding the values of such factors in a market economy country or countries considered to be appropriate by [Commerce]." 19 U.S.C. § 1677b(c)(1) (2000).  The statute, however, does not define the phrase "best available information," it only provides that, "[Commerce], in valuing factors of production . . . , shall utilize, to the extent possible, the prices or costs of factors of production in one or more market economy countries that are--(A) at a level of economic development comparable to  that of the nonmarket economy country, and (B) significant producers of comparable merchandise."  19 U.S.C. § 1677b(c)(4).  Consequently, Commerce is given broad discretion "to determine margins as accurately as possible, and to

use the best information available to it in doing so." <u>Lasko Metal Prods., Inc. v. United States</u>, 43 F.3d 1442, 1443 (Fed Cir. 1994).

The antidumping duty statute authorizes, but does not mandate that Commerce use surrogate countries to estimate the value of the factors of production. In legislative history, Congress provided Commerce with guidance by stating that, "[i]n valuing such factors [of production], Commerce shall avoid using any prices which it has reason to believe or suspect may be dumped or subsidized prices." H.R. Conf. Rep. No. 100-576, at 590 (1988), <u>reprinted in</u> 1988 U.S.C.C.A.N. 1547, 1623 ("<u>House Report</u>"). The <u>House Report</u> further states that, "the conferees do not intend for Commerce to conduct a formal investigation to ensure that such prices are not dumped or subsidized, but rather intend that Commerce base its decision on information generally available to it at that time." H.R. Conf. Rep. No. 100-576, at 590-91, <u>reprinted in</u> 1988 U.S.C.C.A.N. at 1623-24. In addition, Commerce has promulgated regulations regarding the valuation of factors of production in the NME context. The relevant regulations state that "where a factor is purchased from a market economy supplier and paid for in a market economy currency, the Secretary normally will use the price paid to the market economy supplier." 19 C.F.R. § 351.408(c)(1) (2000).

In gathering factual information from interested parties in an antidumping duty proceeding, Commerce regulations set out time limits for the submission of such information. <u>See</u> 19 C.F.R. §

351.301(b)(4) (2000). The regulations state that any submissions of factual information are due no later than "100 days after the date of publication of notice of initiation of the review, except that factual information requested by the verifying officials from a person normally will be due no later than seven days after the date on which the verification of that person is completed . . . ." Id.

## B. Contentions of the Parties

### 1. CPZ's Contentions

CPZ complains that Commerce's interpretation of the House Report is contrary to its plain language and leads to a result contrary to law. See Pl.'s Mem. P. & A. ("CPZ's Mem.")at 15-20. CPZ maintains that the House Report solely concerns the use of surrogate values to determine NV in the NME context. See CPZ's Mem. at 16. CPZ further argues that the House Report does not address the use of market-economy prices. CPZ alleges that "Commerce has now stretched the Legislative History concerning surrogate values to apply to whether it should use market-economy prices as well." CPZ's Mem. at 16. Accordingly, CPZ asserts that Commerce erred in rejecting actual market-economy prices paid. CPZ contends that Commerce should have used these values instead of surrogate values for steel inputs in its final calculation of NV.

CPZ challenges Commerce's determination that it had "reason to believe or suspect" that CPZ's supplier's prices were subsidized. See id. at 21-22. CPZ argues that Commerce had no particularized evidence that "would call [CPZ's supplier's] prices into question." Id. at 22. CPZ contends that the existence of general and non-company specific subsidies in the supplier's country do not provide Commerce with reasonable grounds to believe or suspect the prices paid were subsidized. See id. at 21-22. While CPZ recognizes that the existence of generally available export subsidies may raise a suspicion of subsidized prices, CPZ argues that it overcame such suspicion. See id. at 21.

First, CPZ argues that Commerce's determination that the subsidies CPZ's supplier could have benefitted from were de minimis extinguished such a suspicion. See id. at 23. Second, CPZ contends that it submitted statements from its supplier, stating that the supplier did not benefit from any subsidies, which refuted Commerce's reason to believe or suspect subsidized prices. See id. at 26-27. Consequently, CPZ contends that Commerce had no basis to reject the market-economy prices paid to its supplier, and that Commerce has established an arbitrary and capricious standard to overcome any suspicion that its supplier's prices are subsidized. See id. at 24-26.

Finally, CPZ asserts that Commerce erred in rejecting its February 28, 2002, submission, which was meant to alert Commerce of

its own previous decision in a different review prior to the issuance of the Final Results. See CPZ's Mem. at 28-29. CPZ maintains that it filed the submission the day after Commerce published a notice in the Federal Register extending the period to complete CPZ's review until March 5, 2002. See id. at 28. CPZ argues that the House Report "requires Commerce to make a determination as to reason to believe or suspect that prices may be subsidized based on evidence available to it at the time it reaches its decision." CPZ's Mem. at 28-29. CPZ contends that the submission should have been considered, despite its untimeliness, because it constituted evidence available prior to the rendering of Commerce's final decision. See id. at 29.

### 2.    Commerce's Contentions

Commerce responds that it had a reasonable basis to "believe or suspect" that CPZ's supplier's prices were subsidized. See Def.'s Mem. Opp'n CPZ Mot. J. Agency R. ("Def.'s Mem.") at 20. Commerce argues that it is not precluded from applying the "reason to believe or suspect" standard when general subsidies are used. See id. Rather, Commerce contends that a finding of significant, non-specific export subsidies generally available may serve as "particular and objective evidence" to support a "reason to believe or suspect" that CPZ's supplier's prices were subsidized. Id. at 22. Commerce relied on a study undertaken in conjunction with a

previous review, which found significant generally available subsidies in the supplier's country, to infer that the steel inputs purchased by CPZ may have been subsidized. See id. Commerce contends that the existence of generally available subsidies in CPZ's supplier's country allows the inference that the supplier's prices were subsidized. See id. at 21-22. Consequently, Commerce asserts that its finding of significant, generally available subsidies in the exporting market-economy supports a "reason to believe or suspect" that prices of the input from CPZ's supplier were subsidized. See id. at 22.

Commerce further maintains that the antidumping duty statute and accompanying legislative history do not require it to conduct a formal investigation to support its decision to exclude dumped or subsidized prices. See id. at 23-24. Rather, to determine whether to exclude such prices, Commerce may use information generally available to it. See id. at 23. In addition, Commerce asserts that its finding of de minimis subsidies does not quash its "reason to believe or suspect" that CPZ's supplier's prices were subsidized. See id. at 25-26. Commerce maintains that the level of subsidization is irrelevant in situations where a general export subsidy has been found because a subsidy, regardless of how large, may benefit exports from that country. See id. at 26.

Moreover, Commerce contends that CPZ did not present sufficient evidence to negate its "reason to believe or suspect."

See id. at 28. Commerce argues that the statements CPZ offered as evidence, that its supplier did not benefit from subsidies, were unsupported; that is, they did not contain sales, financial or other empirical economic data. See id. Furthermore, Commerce maintains that CPZ's evidence was less credible than its own study undertaken in conjunction with a previous review of TRBs from the PRC known as the Market Economy Steel Memo of November 7, 2001. See id.

Finally, citing 19 C.F.R. § 351.301(b)(4), Commerce alleges that it did not err in rejecting CPZ's February 28, 2002, submission as untimely. See id. at 31. Commerce asserts that under the regulations, "submission[s] of new factual information for the final results of a new shipper review must be made no later than 100 days after the date of publication of the notice of initiation of the review." Id. Consequently, Commerce maintains that the submission was properly rejected because it was made more than 100 days after the publication of notice of initiation of review. See id.

### 3. Timken's Contentions

Timken generally agrees with Commerce's departure from its normal practice of using market prices paid for inputs purchased from a market-economy supplier when there is "reason to believe or suspect" that the prices are subsidized. See Timken's Resp. Pl.'s

Mot. J. Agency R. ("Timken's Resp.") at 12.  Timken maintains that, according to the House Report, Commerce correctly applied "the reason to believe or suspect" standard.  See Timken's Resp. at 16-17.  In particular, Timken contends that Commerce reasonably limited the reach of its own regulation and "revert[ed] back to the statutory method of employing surrogate-country information."  Id. at 18.  Timken argues that, in doing so, Commerce "gave effect to Congressional intent and conformed to the statutory scheme."  Id. at 19.   Timken also asserts that, according to the House Report guidance, only minimal evidence is necessary to support Commerce's decision to reject prices paid by CPZ to its market-economy supplier.  See Timken's Resp. at 19.  Timken further contends that "Commerce needs only such evidence as is sufficient to form a belief or suspicion."  Id. at 26.  Timken argues that Commerce's reliance upon its own prior study, where it analyzed countervailing duty orders covering subsidy programs in CPZ's supplier's country, is sufficient evidence to support Commerce's rejection of actual prices paid by CPZ.  See id. at 20.  Timken maintains that Commerce reasonably drew the inference that CPZ's supplier may have benefitted from generally available subsidies.  See id.

Timken additionally argues that, "it was clearly appropriate for Commerce to rely on express legislative history to construe and apply its own regulation."  Id. at 22.  Timken asserts that the statute does not direct Commerce to use actual price information to

calculate NV.  See id.  Rather, Commerce developed and codified the practice of using actual prices into regulation as its normal NME methodology.  See id.  Timken disagrees with CPZ's interpretation of the House Report and maintains that Commerce "reasonably read the history as directing the agency to avoid all values that it believed or suspected were unfair, when calculating fair values of goods."  Timken's Resp. at 22-23 (emphasis in original).

Finally, Timken agrees with Commerce that CPZ's February 28, 2002, submission was untimely under Commerce's regulations. Alternatively, Timken argues that the rejection of the submission was harmless because the information provided would not have altered Commerce's "reason to believe or suspect" that CPZ's supplier's prices were subsidized.  See id. at 32.  Timken maintains that "the controlling fact is the mere existence of subsidy programs in the country in question."  Id.  Consequently, even the receipt of de minimis subsidies by a particular producer would not have changed Commerce's position, because the "basis for believing or suspecting remains."  Id.

### C.   Analysis

#### 1.   Commerce Properly Applied the Reason to Believe or Suspect Standard

A preliminary issue the Court must decide is whether Commerce correctly applied the "reason to believe or suspect" standard to support its decision to reject market prices CPZ paid to its

market-economy supplier.  The Court recognizes that the <u>House</u> <u>Report</u> concerns the selection of surrogate values to determine NV in the NME context.  Neither the statute nor the <u>House Report</u> address the use of market value in the calculation of NV.[1]  The Court has established, however, that "nothing in the antidumping duty statute directs Commerce to employ actual prices paid to a market economy supplier by an NME producer in NV calculations." <u>China Nat'l Mach. Imp. & Exp. Corp. v. United States</u>, 27 CIT __, __, 264 F. Supp. 2d 1229, 1236 (2003).  Furthermore, in <u>Lasko</u>, the CAFC recognized that the purpose of the statute "is to prevent dumping, an activity defined in terms of the marketplace."  43 F.3d at 1446.  Therefore, the use of suspect prices to calculate NV, even when paid to a market-economy supplier, would be contrary to Congress' intent.

The Court finds that when Commerce has reason to believe or suspect that a market-economy supplier's prices are subsidized, Commerce may reject market prices paid to the supplier in favor of

---

[1]  CPZ contends that Commerce's construction of the <u>House</u> <u>Report</u> is contrary to its plain language and leads to a result Congress cannot have intended. CPZ's Mem. at 16.  The Court notes, however, that legislative history is merely extrinsic evidence to be used by a court in determining Congress' intent when a statute is silent or ambiguous.  If a statute is silent or ambiguous, the court's role is to determine whether Commerce's construction of the statute is reasonable.  Commerce is required to reasonably interpret the statute and not the legislative history.

surrogate prices for its calculation of NV.[2] The Court is unconvinced by CPZ's argument that Commerce's regulations require Commerce to use actual prices paid whenever available. The Court finds that the applicable regulations do not require Commerce to use the market value over a surrogate value. The regulations state that Commerce "normally will value the factor using the price paid to the market economy supplier." 19 C.F.R. § 351.408 (c)(1). The regulation merely advises Commerce to use actual market values to calculate NV for an NME supplier in certain circumstances. As the Court stated, "while Commerce will use market values under normal circumstances, under certain circumstances Commerce may choose not to do so." China Nat'l, 27 CIT at __, 264 F. Supp. 2d at 1237, (noting that the regulation "merely indicates a preference for market prices"); see also Anshan Iron & Steel Co., Ltd. v. United States, 27 CIT __, __, 2003 Ct. Intl. Trade LEXIS 109, at *40 (CIT 2003) (stating that the language "merely suggests a particular methodology, but does not impose upon Commerce the requirement of selecting the market-economy price of a respondent's purchases to

---

[2] The Court notes that the use of surrogate values by Commerce has been determined to be contrary to the intent of the law "'where we can determine that a NME producer's input prices are market determined, accuracy, fairness, and predictability are enhanced by using those prices.'" Lasko, 43 F.3d at 1446 (quoting Oscillating Fans and Ceiling Fans from the People's Republic of China, 56 Fed. Reg. 55271, 55275 (Dep't Comm. 1991) (final determination)(emphasis added)). If the prices paid are not market determined, however, Commerce in pursuit of the law's intent may reject actual prices paid.

the exclusion of more appropriate values").

While the Court recognizes that surrogate country values are only an estimation of what the product's NV would have been if the NME were a market-economy country, see Rhodia, Inc. v. United States, 25 CIT __, __, 185 F. Supp. 2d 1343, 1351 (2001), Commerce's decision to use actual prices paid or surrogate values is predicated on which values provide a more accurate NV. See Lasko, 43 F.3d at 1446, (noting that the purpose of the statute is to prevent dumping and that it "sets forth procedures in an effort to determine margins 'as accurately as possible'") (quoting Rhone Poulenc, Inc. v. United States, 899 F.2d 1185, 1191 (Fed. Cir. 1990)). When Commerce has substantial evidence that prices paid to a market-economy supplier are not market determined, then the "use of such prices would undermine 'accuracy, fairness, and predictability,' in the calculation of margins and contravene the antidumping and countervailing duty statute . . . ." China Nat'l, 27 CIT at __, 264 F. Supp. 2d at 1237 (quoting Lasko, 43 F.3d at 1446). The overarching principle of the statute prevents the Court from concluding "that Congress would condone the use of any value where there is 'reason to believe or suspect' that it reflects dumping or subsidies." China Nat'l, 27 CIT at __, 264 F. Supp. 2d at 1238.

Section 1677b(c)(1) of Title 19 of the United States Code directs Commerce to use "the best available information" concerning

the values for factors of production from a market-economy when calculating the NV for a product exported from an NME country, such as the PRC.  See China Nat'l, 27 CIT at __, 264 F. Supp. 2d at 1234.  The CAFC has reasoned that "there is much in the statute [19 U.S.C. § 1677b(c)(1) and (4)] that supports the notion that it is Commerce's duty to determine margins as accurately as possible, and to use the best information available to it in doing so."  Lasko, 43 F.3d at 1443; see also Shakeproof Assembly Components, Div. of Ill. Tool Works, Inc. v. United States, 268 F.3d 1376, 1382 (Fed. Cir. 2001).

The Court's role in this case is not to evaluate whether the information Commerce used was the best available, but rather whether Commerce's choice of information is reasonable.[3]  See China Nat'l, 27 CIT at __, 264 F. Supp. 2d at 1236.  Commerce's discretion in choosing its information is limited by the statute's ultimate goal "to construct the product's normal value as it would have been if the NME country were a market economy country."  Rhodia, 25 CIT at __, 185 F. Supp. 2d at 1351.  While Commerce enjoys broad discretion in determining what constitutes the best

_____

[3]  The statute's silence regarding the definition of "best available information" provides Commerce with "broad discretion to determine the 'best available information' in a reasonable manner on a case-by-case basis." Timken Co. v. United States, 25 CIT __, __, 166 F. Supp. 2d 608, 616 (2001).  Furthermore, in evaluating the data, the statute does not require Commerce to follow any single approach. See Luoyang Bearing Factory v. United States, 26 CIT __, __, 240 F. Supp. 2d 1268, 1284 (2002).

information available to calculate NV, Commerce may not act arbitrarily in reaching its decision.  If Commerce's determination of what constitutes the best available information is reasonable, then the Court must defer to Commerce.  If Commerce reasonably believed or suspected that CPZ's supplier's prices were subsidized, then Commerce could decide that surrogate prices were the best information available.  Based upon this determination, Commerce has authority under the antidumping duty statute to use such values instead of the actual prices paid by CPZ in calculating NV.

### 2.    Commerce Had Reason to Believe or Suspect that CPZ's Supplier's Prices Were Subsidized

The Court must determine whether Commerce had "reason to believe or suspect" that CPZ's supplier's prices were distorted by subsidies.  In China Nat'l, 27 CIT at __, 264 F. Supp. 2d at 1239, the Court recognized that the applicable standard has no statutory definition.   The Court noted, however, that "in order for reasonable suspicion to exist there must be 'a particularized and objective basis for suspecting' the existence of certain proscribed behavior, taking into account the totality of the circumstances, the whole picture."  Id. (quoting Al Tech Specialty Steel Corp. v. United States, 6 CIT 245, 247, 575 F. Supp. 1277, 1280 (1983)).  While Commerce must support its determinations with "substantial, specific and objective evidence," China Nat'l, 27 CIT at __, 264 F. Supp. 2d at 1240, the Court agrees with Commerce that the

antidumping duty statute does not require a formal investigation. Congress did not intend for Commerce to undertake an investigation to determine whether prices were in fact subsidized. Rather, the statute and House Report merely require Commerce to have a "reason to believe or suspect" that prices are being subsidized. Consequently, to determine whether there is a "reason to believe or suspect" that prices are subsidized, Commerce may rely on information generally available to it to support its determination. To conclude that it has reason to believe or suspect that prices are subsidized, Commerce must rely on information generally available to it that adequately supports the reasons given for such a determination.

The Court finds that Commerce based its determination to reject the prices CPZ paid its supplier on evidence that adequately supports its decision. Commerce's reason to believe or suspect that CPZ's supplier's prices were subsidized stemmed from a study, undertaken in connection with a previous investigation of steel products, in which Commerce discovered significant subsidies. These subsidies were not company specific, but were generally available in the exporting market-economy country. CPZ contends that these subsidies are de minimus and, therefore, do not support Commerce's decision to reject the actual prices paid. The level of subsidization does not prevent Commerce from determining that it has "reason to believe or suspect" that prices paid are subsidized.

Any level of subsidization found in the exporting country is enough evidence to support a determination that Commerce has "reason to believe or suspect" that prices are distorted.  The Court finds that Commerce made a logical inference that CPZ's supplier may have benefitted from the generally available subsidies.[4]  Without conducting a formal investigation, Commerce used information available to it to adequately support its decision to exclude actual prices paid by CPZ.

Once Commerce presents adequate evidence to support its "reason to believe or suspect" that prices are subsidized, a rebuttable presumption is established that the prices paid are distorted.  See Luoyang Bearing Factory v. United States, 27 CIT __, __, 2003 Ct. Intl. Trade LEXIS 142 at *10 (CIT 2003).  The presumption is that the market-economy supplier benefitted from subsidies.  Based on this presumption, Commerce may choose to discard the prices paid and use surrogate values to calculate NV. The presumption, however, is not conclusive.  The presumption shifts the burden to the party challenging Commerce's determination to present evidence demonstrating that its supplier did not benefit

---

[4]  CPZ asserts that Commerce did not investigate whether its supplier received any subsidies and that the supplier has never been a respondent in any countervailing or antidumping duty investigation or reviews Commerce relies upon to support its determination.  The Court notes that contrary to CPZ's assertion, the statute does not require Commerce to conduct a formal investigation.  Rather, Commerce is merely required to base its determination upon information generally available.

from such subsidies.[5]

The Court finds that CPZ did not present enough evidence to rebut this presumption.  CPZ contends that it "attempted to overcome Commerce's suspicion with a statement from its supplier that it did not benefit from any subsidies."  CPZ's Mem. at 26-27. The Court, however, agrees with Commerce that the statements placed on the record by CPZ do not controvert Commerce's "reason to believe or suspect" that its supplier benefitted from generally available subsidies.[6]  The statements did not contain financial data or any other information indicating that the supplier's prices were not subsidized.  The Court recognizes that manufacturers, such as CPZ, may present evidence other than financial data and empirical economic information to rebut the presumption of benefitting from subsidies.  However, if there was conclusive evidence to support the statements that its supplier did not benefit from subsidies, CPZ would certainly have placed such

---

[5]    Sufficient evidence that the prices paid were market-determined, for example, would satisfy the manufacturer's burden. Additionally, credible evidence that the supplier did not participate in any subsidies programs would satisfy the burden.

[6]    One of the statements presented to Commerce by CPZ was a letter from the General Manager of CPZ's supplier's overseas sales department stating that the company did not benefit from subsidies. The other was a signed declaration by another employee of CPZ's supplier stating that the supplier does not produce the type of steel Commerce had found to benefit from subsidies in its study.

evidence on the record.[7]  CPZ did not effectively rebut the presumption that CPZ's supplier benefitted from subsidies. Consequently, Commerce's determination that there was a "reason to believe or suspect" that the prices paid were subsidized was reasonable and in accordance with law.

### 3.    Commerce Appropriately Rejected CPZ's Submission as Untimely

Commerce's regulations clearly set out the deadlines for submissions of factual information for new shipper reviews. See 19 C.F.R. § 351.301(b)(4).  The regulations state that a submission of factual information must be made no more than 100 days after the date of publication of notice of initiation of the review.  While CPZ maintains that Commerce should not have rejected its submission, the Court does not agree.  The date of the notice was January 31, 2001, and the submission was made more than one year later, on February 28, 2002.  The regulation is clear and CPZ failed to adhere to the procedural deadline imposed by the

---

[7] To overcome the suspicion, CPZ argues that "respondents are now in the untenable position of having to ask that their suppliers be investigated in order to rule out the possibility that their supplier's prices are subsidized," and that "it may be impossible for respondents like CPZ to overcome any suspicion that their supplier's prices are subsidized." See CPZ's Mem. at 26 (emphasis in original).  The Court notes, however, that CPZ could have submited other evidence, such as economic data, to overcome the presumption established against the actual prices paid.  The Court is unconvinced that the statements made by the employees of CPZ's supplier are the best available evidence that the supplier did not benefit from the generally available subsidies.

regulations.

The Court has considered other arguments raised by CPZ regarding Commerce's failure to consider CPZ's arguments and finds that they are without merit.

### CONCLUSION

The Court affirms Commerce's final results and finds that the rejection of actual prices paid by CPZ for steel inputs from its market-economy supplier was in accordance with law.

_____
NICHOLAS TSOUCALAS
SENIOR JUDGE

Dated:    December 12, 2003
New York, New York