SLIP OP. 03-169

UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: RICHARD K. EATON, JUDGE

_____

|  |  |  |
|---|---|---|
| FUYAO GLASS INDUSTRY GROUP CO., LTD., GREENVILLE GLASS INDUSTRIES, INC., SHENZHEN BENXUN AUTOMOTIVE GLASS CO., LTD., TCG INTERNATIONAL, INC., CHANGCHUN PILKINGTON SAFETY GLASS CO., LTD., GUILIN PILKINGTON SAFETY GLASS CO., LTD., WUHAN YAOHUA PILKINGTON SAFETY GLASS CO., LTD., AND XINYI AUTOMOTIVE GLASS (SHENZHEN) CO., LTD., | : : : : : : : : : : | |
| PLAINTIFFS, | : : | |
| V. | : : | CONSOL. COURT NO. 02-00282 |
| UNITED STATES, | : : : : | |
| DEFENDANT, | : : | |
| AND | : : | |
| PPG INDUSTRIES, INC., SAFELITE GLASS CORPORATION, AND VIRACON/CURVLITE, A subsidiary of APOGEE ENTERPRISES, INC., | : : : : | |
| DEF.-INTERVENORS. | : : | |

_____

[Commerce's Final Determination on windshields from the P.R.C., sustained in part and remanded in part]

Decided: December 18, 2003

*Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt, LLP* (*Bruce M. Mitchell*, *Jeffrey S. Grimson*, and *Mark E. Pardo*), for plaintiffs Fuyao Glass Industry Group Co., Ltd., and Greenville Glass Industries, Inc.

*Garvey, Schubert & Barer* (*William E. Perry* and *John C. Kalitka*), for plaintiffs Shenzhen Benxun Automotive Glass Co., Ltd., and TCG International, Inc.

*Pepper Hamilton, LLP* (*Gregory C. Dorris*), for plaintiffs Changchun Pilkington Safety Glass Co., Ltd., Guilin Pilkington Safety Glass Co., Ltd., and Wuhan Yaohua Pilkington Safety Glass Co., Ltd.

*White & Case* (*William J. Clinton* and *Adams C. Lee*), for plaintiff Xinyi Automotive Glass (Shenzhen) Co., Ltd.

*Peter D. Keisler*, Assistant Attorney General, Civil Division, United States Department of Justice; *David M. Cohen*, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (*Stephen C. Tosini*), for defendant United States.

*Stewart & Stewart* (*Terence P. Stewart*, *Eric P. Salonen*, and *Sarah V. Stewart*), for defendant-intervenors PPG Industries, Inc., Safelite Glass Corporation, and Viracon/Curvlite, a subsidiary of Apogee Enterprises, Inc.

OPINION AND ORDER

EATON, *Judge*: This matter is before the court, in this consolidated action, on motions for judgment upon the agency record filed by plaintiffs Fuyao Glass Industry Group Co., Ltd., and Greenville Glass Industries, Inc. (collectively, "Fuyao"), Xinyi Automotive Glass (Shenzen) Co., Ltd. ("Xinyi"), Changchun Pilkington Safety Glass Co., Ltd., Guilin Pilkington Safety Glass Co., Ltd., and Wuhan Yaohua Pilkington Safety Glass Co., Ltd. (collectively, "the Changchun Plaintiffs"), and defendant-intervenors PPG Industries, Inc., Safelite Glass Corporation, and Viracon/Curvlite, a subsidiary of Apogee Enterprises, Inc. (collectively, "PPG"). By their motions the parties contest certain aspects of the United States Department of Commerce's ("Commerce") final determination concerning the antidumping duty order covering automotive

replacement glass windshields ("Windshields") from the People's Republic of China ("PRC").[1]

*See* Certain Automotive Replacement Glass Windshields From The P.R.C., 67 Fed. Reg. 6482

(ITA Feb. 12, 2002) (final determination) ("Final Determination"), *amended by* Certain

Automotive Replacement Glass Windshields from the P.R.C., 67 Fed. Reg. 11,670 (ITA Mar. 15,

2002) ("Am. Final Determination").  The court has jurisdiction over this matter pursuant to 28

U.S.C. § 1581(c) (2000) and 19 U.S.C. § 1516a(a)(2)(B)(iii) (2000).  For the following reasons

this matter is remanded to Commerce with instructions to conduct further proceedings in

conformity with this opinion.[2]

## STANDARD OF REVIEW

The court "shall hold unlawful any determination, finding, or conclusion found . . . to be

unsupported by substantial evidence on the record, or otherwise not in accordance with law. . . ."

19 U.S.C. § 1516a(b)(1)(B)(i); *Huaiyin Foreign Trade Corp. (30) v. United States*, 322 F.3d

1369, 1374 (Fed. Cir. 2003) (quoting 19 U.S.C. § 1516a(b)(1)(B)(i) (2000)).  "Substantial

evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion.'"  *Huaiyin,* 322 F.3d at 1374 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197,

229 (1938)).  The existence of substantial evidence is determined "by considering the record as a

---

[1]    All plaintiffs, as well as defendant-intervenors PPG, have filed memoranda in support of their motions for judgment upon the agency record.  *See* Fuyao's Mem. Supp. Mot. J. Agency R. ("Fuyao Mem."); Xinyi's Mem. Supp. Mot. J. Agency R. ("Xinyi Mem."); Changchun's Mem. Supp. Mot. J. Agency R. ("Changchun Mem."); and PPG's Mem. Supp. Mot. J. Agency R. ("PPG Mem.").  The Government filed a consolidated response to all ("Gov't Brief").

[2]    For information regarding the float glass production process, see http://ajzonca.tripod.com/glassprocess.html (last visited Dec. 16, 2003).

whole, including evidence that supports as well as evidence that 'fairly detracts from the substantiality of the evidence.'" *Id.* (citing *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984)). "In reviewing the Department's construction of a statute it administers, [the court defers] to the agency's reasonable interpretation of the antidumping statutes if not contrary to an unambiguous legislative intent as expressed in the words of the statute." *Id.* at 1374–75 (citing *Timex V.I., Inc. v. United States*, 157 F.3d 879, 881–82 (Fed. Cir. 1998)); *see also Pesquera Mares Australes Ltda. v. United States*, 266 F.3d 1372, 1382 (Fed. Cir. 2001) ("[W]e conclude . . . that statutory interpretations articulated by Commerce during its antidumping proceedings are entitled to judicial deference under *Chevron*.") (citing *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984)). Furthermore, "[a]s long as the agency's methodology and procedures are reasonable means of effectuating the statutory purpose, and there is substantial evidence in the record supporting the agency's conclusions, the court will not impose its own views as to the sufficiency of the agency's investigation or question the agency's methodology." *Ceramica Regiomontana, S.A. v. United States*, 10 CIT 399, 404–05, 636 F. Supp. 961, 966 (1986), *aff'd* 810 F.2d 1137 (Fed. Cir. 1987) (citing *Chevron*, 467 U.S. at 843; *Abbott v. Donovan*, 6 CIT 92, 97, 570 F. Supp. 41, 46–47 (1983)).

BACKGROUND

Commerce initiated its investigation of the Windshields from the PRC in March 2001, in response to a petition filed by PPG. *See* Certain Automotive Replacement Glass Windshields From the P.R.C., 66 Fed. Reg. 48,233 (ITA Sept. 19, 2001) (prelim. determination) ("Prelim. Determination"). The period of investigation for the subject merchandise was July 1, 2000,

through December 31, 2000.  *See* Final Determination, 67 Fed. Reg. at 6483.  As in previous

investigations, Commerce treated the PRC as a nonmarket economy ("NME") country.[3]  *See id*.

In investigating imports from NME countries, Commerce is directed, under certain

circumstances, to value the factors of production based on surrogate data from an appropriate

market economy country or countries.[4]  *See* 19 U.S.C. § 1677b(c)(1).  For PRC cases, Commerce

has often selected India as the surrogate country of comparable economic development if it is a

significant producer of comparable merchandise.  *See* Prelim. Determination, 66 Fed. Reg. at

48,238.  In this case, Commerce selected India as the surrogate country for the PRC because

Commerce found it to be a significant producer of Windshields.  *See id.*

On April 17, 2001, the United States International Trade Commission ("ITC") issued its

affirmative preliminary determination that there existed a reasonable indication that an industry

in the United States was materially injured by reason of imports of the subject merchandise from

the PRC.  *See* Automotive Replacement Glass Windshields From China, 66 Fed. Reg. 20,682

---

[3]      A "nonmarket economy" country is defined as "any foreign country that the administering authority determines does not operate on market principles of cost or pricing structures, so that sales of merchandise in such country do not reflect the fair value of the merchandise."  19 U.S.C. § 1677(18)(A).  "Any determination that a foreign country is a nonmarket economy country shall remain in effect until revoked by the administering authority."  19 U.S.C. § 1677(18)(C)(i).

[4]      In valuing factors of production for merchandise exported from an NME country, when appropriate, Commerce is directed to use "the best available information regarding the values of such factors in a market economy country or countries considered to be appropriate by the administering authority."  19 U.S.C. § 1677b(c)(1).  To the extent possible, Commerce is directed to select market economy countries that (1) are at a level of economic development comparable to that of the NME country; and (2) are significant producers of comparable merchandise.  19 U.S.C. § 1677b(c)(4).  *See* Prelim. Determination, 66 Fed. Reg. at 48,238.

(ITC Apr. 24, 2001) (prelim. determination). Commerce then sent antidumping questionnaires to

a number of known producers of the subject merchandise,[5] responses to which were timely filed.

Because these producers were numerous, Commerce selected Fuyao and Xinyi as mandatory

respondents,[6] as they were the two largest cooperative exporters, accounting for the majority of

all exports of Windshields from the PRC during the period of investigation.[7]

Commerce published the preliminary results of its investigation on September 19, 2001.

It determined that certain Windshields from the PRC were being, or were likely to be, sold in the

United States at less than fair value. Relying on information submitted by Fuyao, Xinyi, and the

Changchun Plaintiffs, Commerce found that each company demonstrated an absence of

---

[5]        Those producers were Fuyao; Xinyi; the Changchun Plaintiffs; Benxun;
Dongguan Kongwan Automobile Glass; Guandong Lunjiao Autoglass Co.; Jieyang Jiantong
Automobile Glass Co., Ltd.; Shanghai Yanfeng Automotive Trim Co.; Shanghai Fu Hua Glass
Co., Ltd.; Tianjin Riban Glass Co., Ltd.; Luoyang Float Glass Group Import & Export Corp.;
Hebei Tong Yong Glass Industry Limited Co.; Yantai Yanhua Glass Products Co., Ltd.; and
Hangzhou Safety Glass Co., Ltd. Commerce also identified for the Embassy of the PRC a large
number of other potential producers/exporters designated in PPG's petition for which Commerce
did not have addresses, and notified the PRC government that it was responsible for ensuring that
volume and value information for those companies was provided to Commerce. *See* Prelim.
Determination, 66 Fed. Reg. at 48,233.

[6]        Fuyao and Xinyi were selected by Commerce for full investigation. While the
Changchun Plaintiffs cooperated by timely filing responses to Commerce's questionnaires,
Commerce did not conduct a full investigation of these companies. All other producers received
the PRC-wide rate (the "PRC-wide entity").

[7]        The Changchun Plaintiffs' final antidumping duty margins are based on the final
antidumping duty margins, as amended, of mandatory respondents Fuyao and Xinyi, both of
which are challenging Commerce's Final Determination and Amended Final Determination in
this action. *See* 19 U.S.C. § 1673d(c)(5). Should Fuyao and/or Xinyi be successful in reducing
their respective antidumping duty margins, the Changchun Plaintiffs seek to have their respective
antidumping duty margins recalculated accordingly. *See* Changchun Mem. at 3.

government control, both in law and in fact.[8] *See* Prelim. Determination, 66 Fed. Reg. at 48,236. Therefore, Commerce granted separate antidumping duty deposit rates to each company and issued an antidumping duty order pursuant to which Fuyao and Xinyi received company-specific antidumping duty margins of 9.79% and .05%,[9] respectively. *See id.* at 48,242. The Changchun Plaintiffs were each assigned an "all others" antidumping duty margin[10] equal to the weighted average of all the calculated margins (in this case, Fuyao's margin of 9.79% and Xinyi's margin of .05%), excluding any zero or *de minimis* margins (Xinyi's margin of .05%). *Id.* at 48,242; *see also Serampore Indus. Pvt. Ltd. v. United States*, 12 CIT 825, 826, 696 F. Supp. 665, 667 (1988) ("Commerce indicates [that] it is a long standing practice to exclude firms that receive zero or *de minimis* margins."). Thus, the Changchun Plaintiffs' antidumping duty margin was 9.79%, i.e., the same as Fuyao's antidumping duty margin, since Xinyi's *de minimis* margin was excluded

---

[8]     In an NME situation, it is Commerce's policy to assign all exporters of the subject merchandise a single antidumping duty rate, unless an exporter can demonstrate that it is sufficiently independent of government control so as to be entitled to a separate rate. Commerce's test for whether a company is eligible for a separate rate focuses on control over investment, pricing, and the output decision-making process at the individual firm. *See* Prelim. Determination, 66 Fed. Reg. at 48,235. For a complete discussion of the *de jure* and *de facto* factors Commerce considers in such determinations, see Certain Cut-to-Length Carbon Steel Plate from Ukraine, 62 Fed. Reg. 61,754, 61,758–59 (ITA Nov. 19, 1997) (final determination).

[9]     This rate is considered *de minimis*. A weighted-average dumping rate is *de minimis* if Commerce determines that it is less than 2% *ad valorem*. *See* 19 U.S.C. § 1673b(b)(3).

[10]     The Changchun Plaintiffs submitted responses to Commerce's questionnaire seeking volume and value of U.S. sales information, but were not selected to be investigated. Thus, they were assigned the "all others" antidumping duty margin based on the margins calculated for those producers/exporters that were selected for investigation. *See* Prelim. Determination, 66 Fed. Reg. at 48,241. Those exporters who failed to respond to Commerce's initial questionnaire were assigned the PRC-wide margin in accordance with Commerce's long-standing practice. *See Sigma Corp. v. United States*, 117 F.3d 1401, 1411 (Fed. Cir. 1997).

from the weighted average.  *Id.*

On September 21, 2001, Fuyao and PPG timely filed allegations that Commerce had made ministerial errors in its Preliminary Determination.  *See* Automotive Replacement Glass From the P.R.C., 66 Fed. Reg. 53,776, 53,776 (ITA Oct. 24, 2001) (am. prelim. determination). After reviewing the allegations, Commerce corrected several ministerial errors and reduced Fuyao's margin to 3.04%.  *See id.* at 53,778.

In November 2001, Commerce conducted sales and factors of production verifications for Fuyao and Xinyi.  *See* Final Determination, 67 Fed. Reg. at 6483–84.  Based on its findings at verification and its analysis of comments received, Commerce made adjustments to the methodology used to calculate the final antidumping duty margins for Fuyao and Xinyi and made changes to the surrogate country values.  *See id.* at 6484.  Final antidumping duty margins were calculated as follows: 9.67% for Fuyao; 3.70% for Xinyi; 8.22% for the Changchun Plaintiffs; and 124.50% for the PRC-wide entity.  *See id.*

On February 14, 2002, Fuyao, Xinyi, and PPG timely filed allegations that Commerce made ministerial errors in its Final Determination.  *See* Am. Final Determination, 67 Fed. Reg. at 11,670.  After reviewing the allegations, Commerce revised the final determination of the antidumping duty margins for Fuyao, Xinyi, and the Changchun Plaintiffs as follows: Fuyao, 11.80%; Xinyi, 3.71%; and the Changchun Plaintiffs, 9.84%.  *See id.* at 11,673.  The antidumping duty margin for the PRC-wide entity remained unchanged at 124.50%.  *See id.*

In this action, Fuyao, Xinyi, and the Changchun Plaintiffs, as well as PPG, challenge certain aspects of Commerce's Amended Final Determination regarding the antidumping duty margins assigned to Fuyao and Xinyi. In particular, Fuyao challenges six aspects of Commerce's Final Determination; Xinyi joins Fuyao on the first three: (1) whether Commerce erred in disregarding Fuyao's and Xinyi's market economy purchases of float glass; (2) whether Commerce's treatment of water as a direct material resulted in double counting; and (3) whether Commerce's exclusion of the cost of "stores and spare parts" in its calculation of the factory overhead ratio resulted in double counting. Fuyao alone further challenges 1) whether Commerce erred in excluding the "St. Gobain" financial data from its calculation of the surrogate profit ratio; 2) whether Commerce improperly excluded St. Gobain's "purchase of traded goods" from its calculation of the selling, general, and administrative expenses ("SG&A") ratio; and 3) whether Commerce incorrectly rejected Fuyao's actual market prices paid for ocean freight in favor of a surrogate value. For its part, PPG challenges Commerce's methodology for calculating ocean freight, its selection of a surrogate value for electricity, and its methodology for calculating SG&A, factory overhead ("FOH"), and profit.

DISCUSSION

I.      *Commerce's Determination With Regard to Market Economy Purchases of Float Glass*[11]

      A.      *Commerce's Decision to Avoid Subsidized Prices*

First, Fuyao challenges Commerce's finding that substantial evidence on the record provided Commerce with a reason to believe or suspect that prices paid by Fuyao for the factor of production "float glass" from the market economy countries of Korea, Thailand, and Indonesia may have been distorted by broadly available subsidies in those countries. *See* Prelim. Determination, 66 Fed. Reg. at 48,238. Fuyao argues that the legislative history Commerce relied upon in disregarding Fuyao's float glass purchases is not applicable to market economy purchases. *See* Fuyao Mem. at 10–11.

Fuyao begins by stating that "there is no dispute that [Fuyao] made 'market economy purchases' of float glass. That is to say, Fuyao purchased float glass from suppliers located in market economy countries . . . and paid for these purchases in a market economy currency." Fuyao Mem. at 7. Fuyao further states that "[i]t is also undisputed that Commerce has a long-standing policy in NME cases of using such market economy purchases to value a respondent's inputs in lieu of resorting to a surrogate value." *Id.* (citing 19 C.F.R. § 351.408(c)(1) (2000)). Fuyao argues that

> [d]espite this recognized distinction between the use of surrogate
> values and actual market economy prices, Commerce disregarded
> Fuyao's market economy purchases of float glass by claiming that

---

[11]      Xinyi also disputes Commerce's determination with regard to this issue. Because Xinyi's arguments are substantially the same as Fuyao's, they are not addressed separately in the court's analysis.

> the price of these purchases may have been distorted by subsidies.
> As authority for this decision, Commerce stated that "[t]he
> legislative history and recent Department determinations support
> the principal [sic] that we should disregard prices we have reason
> to believe or suspect are distorted by subsidies."

*Id*. at 9 (bracketing in original) (citing Issues and Decision Mem. for the Final Results of

Antidumping Investigation of Automotive Replacement Glass Windshields From the P.R.C.,

Conf. R. Doc. 119 at 10, *reprinted in* 67 Fed Reg. 6482 ("Issues and Decision Mem.").

With respect to its decision to disregard prices that it believes or suspects to be distorted

by subsidies, Commerce states:

> In the underlying investigation, Commerce was guided by
> Congress's instruction in the legislative history of the Omnibus
> Trade and Competitiveness Act of 1988, to avoid using prices in
> valuing factors that Commerce has reason to believe or suspect
> may be distorted by subsidies.

Gov't Brief at 22.

The legislative history relied upon by Commerce concerns the use of surrogate values for

factors of production in NME cases, pursuant to 19 U.S.C. § 1677b(c)(4).[12] The legislative

---

[12]     Title 19 U.S.C. § 1677b(c)(4) states:

The administering authority, in valuing factors of production under
paragraph (1) [i.e., with respect to surrogate values], shall utilize,
to the extent possible, the prices or costs of factors of production in
one or more market economy countries that are—

(A) at a level of economic development comparable to that of the
nonmarket economy country, and

(B) significant producers of comparable merchandise.

history states in relevant part:

> The factors [of production for the merchandise subject to
> investigation] would be valued from the best available evidence in
> a market economy country (or countries) that is at a comparable
> level of economic development as the country subject to
> investigation and is a significant producer of the comparable
> merchandise. . . .  In valuing such factors, *Commerce shall avoid*
> *using any prices which it has reason to believe or suspect may be*
> *dumped or subsidized prices*.

Omnibus Trade and Competitiveness Act of 1988, Conference Report to Accompany H.R.3,

H.R. Rep. No. 576, 100th Cong., 2nd Sess., at 590–91 (1988) ("Conf. Rep.") (emphasis added).

Fuyao contends that Congress's directive to Commerce to avoid using prices believed or

suspected to be dumped or subsidized applies to surrogate prices only.  Thus, Fuyao argues, since

the values at issue here are based on market economy purchases, and "market economy purchases

are not used pursuant to the surrogate value methodology," these market economy purchases are

not limited by the Conference Report's counsel relating to surrogate values.  Fuyao Mem. at 13.

Fuyao states:

> In sum, the legislative history that Commerce relied upon discusses
> guidelines for the selection of surrogate values.  These criteria were
> never intended to restrict Commerce's use of actual market
> economy purchase prices, which the courts have repeatedly stated
> provide a far more accurate calculation of normal value.

*Id*.

On this point, Commerce claims that

---

19 U.S.C. § 1677b(c)(4)(A)-(B).

>[c]ontrary to [Fuyao's] argument, a distinction between a market economy purchase price and a surrogate price to value factors in a NME case does not lead to a finding that Congress's instruction to avoid subsidized prices is not applicable to the market economy purchase values.

Gov't Brief at 23.

Fuyao further relies on *Lasko Metal Products, Inc. v. United States,* 43 F.3d 1442 (Fed. Cir. 1994), and *Timken Co. v. United States*, 26 CIT __, 201 F. Supp. 2d 1316 (2002), for the proposition that surrogate value provisions of 19 U.S.C. § 1677b(c)(4) are not applicable to purchases from market economy suppliers.  It argues:

>[In *Lasko*], the appellate court found that Commerce could use some surrogate values pursuant to the nonmarket economy methodology [described in Section 19 U.S.C. § 1677b(c)(4) (selected based on the criteria discussed in the statute and the legislative history)] and use some market economy purchases pursuant to the "normal" market economy provision for calculating constructed value.  This court decision confirms that market economy purchases are *not* governed by the restrictions applicable to surrogate value selections, which means that they should not be disregarded even if there is reason to believe suspect that they may be subsidized.

>[In *Timken,*] Timken claimed in part that Commerce was required [by 19 U.S.C. § 1677b(c)(4)] to use surrogate values if possible and "[n]owhere in its final determination does [Commerce] explain that it was not 'possible' to use Indian or other surrogate values according to the expressed statutory requirements. . . . This Court rejected Timken's argument, stating that it "disagrees with Timken that Commerce is required to value [factors of production] pursuant to § 1677[b](c)(4) prior to resorting to a PRC trading company's import prices paid to a market-economy supplier to value material costs for . . . inputs."

Fuyao Mem. at 12–13 (internal citations omitted) (emphasis in original).

Fuyao's reliance on *Lasko* and *Timken* is misplaced. Although both the *Lasko* and *Timken* courts state that the surrogate value provisions of 19 U.S.C. § 1677b(c)(4) do not apply to purchases from market economy suppliers, this does not, in turn, mean that Congress's *instructions* regarding those guidelines (i.e., that Commerce "shall avoid using any prices which it has reason to believe or suspect may be dumped or subsidized prices," Conf. Rep. at 590) cannot be used by Commerce when constructing its methodology with respect to market economy purchases. Indeed, Commerce is fully justified in relying on those instructions to establish the reasonableness of its methodology in an NME situation. "[T]he goals of accuracy, fairness, and predictability should apply whether a country's economy is market or nonmarket oriented." *Tianjin Mach. Imp. & Exp. Corp. v. United States*, 16 CIT 931, 941, 806 F. Supp. 1008, 1018 (1992). These goals would also be pertinent whenever market values are involved. As the Court explained in *China National Machinery Imp. & Exp. Corp. v. United States*, 27 CIT __, __, 264 F. Supp. 2d 1229, 1237–38 (2003),

> [i]t is true . . . that the "reason to believe or suspect" standard articulated in the House Report explicitly refers only to a selection among surrogate prices, as opposed to a choice between surrogate and market values. . . . However, if Commerce had "reason to believe or suspect" that [the subject market economy purchases] were subsidized, Commerce may employ surrogate values where it determines that they are the best information under the statute.

*Id*. (emphasis omitted); *see also Peer Bearing Co. v. United States*, 27 CIT __, __, slip op. 03-160 at 13 (Dec. 12, 2003) ("[W]hen Commerce has reason to believe or suspect that a market-economy supplier's prices are subsidized, Commerce may reject market prices paid to the supplier in favor of surrogate prices for its calculation of [normal value].").

Furthermore, this Court and the Court of Appeals for the Federal Circuit have repeatedly upheld Commerce's broad discretion in valuing factors of production. *See Lasko*, 43 F.3d at 1446; *see also Sigma*, 117 F.3d at 1405 ("Commerce . . . has broad authority to interpret the antidumping statute . . . ."). In valuing such factors, "the critical question is whether the methodology used by Commerce is based on the best available information and establishes antidumping duty margins as accurately as possible." *Shakeproof Assembly Components, Div. of Ill. Tool Works, Inc. v. United States*, 268 F.3d 1376, 1382 (Fed. Cir. 2001). Moreover, "the statute grants to Commerce broad discretion to determine the 'best available information' in a reasonable manner on a case-by-case basis." *Timken,* 26 CIT at __, 201 F. Supp. 2d at 1321 (citing *Lasko*, 43 F.3d at 1446 (noting that the statute "simply does not say—anywhere—that the factors of production must be ascertained in a single fashion.")). Because "Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation. Such legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." *Chevron*, 467 U.S. at 843–44. Finally, it is settled that "statutory interpretations articulated by Commerce during its antidumping proceedings are entitled to judicial deference under *Chevron*." *Pesquera Mares*, 266 F.3d at 1382; *see also Chevron*, 467 U.S. at 843 ("[I]f the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute."). In light of Commerce's broad discretion in selecting values for factors of production, its statutory directive to determine antidumping duty margins as accurately as possible, and the deference that its statutory interpretations are to be afforded under *Pesquera Mares*, the court finds that

Commerce's decision to avoid subsidized prices is reasonable and, accordingly, defers to it.

*China National Machinery* is again instructive:

> [G]iven that the overarching purpose of the antidumping and countervailing duty law is to counteract dumping and subsidies, the court cannot conclude that Congress would condone the use of any value where there is "reason to believe or suspect" that it reflects dumping or subsidies. . . . [I]f Commerce had "reason to believe or suspect" that the [market purchases plaintiff made in this case] were subsidized, Commerce may employ surrogate values where it determines that they are the best information under the statute.

*China Nat'l Mach.*, 264 F. Supp. 2d at 1238.

B.    *Commerce's Reliance on the "Reason to Believe or Suspect" Standard*

Fuyao further argues that, even if the statute allows Commerce to avoid subsidized values, Commerce's determination to reject certain purchases of float glass was improper because substantial evidence does not support its conclusion that there was reason to believe or suspect Fuyao's purchases were, in fact, subsidized.[13]  Fuyao Mem. at 14.  Substantial evidence is relevant evidence that "a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co.*, 305 U.S. at 229.  It is "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).

---

[13]    "Normally, to construct [normal value] for the final product, Commerce uses actual market prices which an NME producer pays for the input from a market economy country since actual prices are the best approximation of the input's value." *China Nat'l Mach.*, 264 F. Supp. 2d at 1232 (citing 19 C.F.R. § 351.408(c)(1)).

In its Final Determination, Commerce concluded that "this particular and objective evidence (that all exporters from these countries can benefit from these broadly available subsidies) supports a reason to believe or suspect that prices of the inputs purchased from these countries are subsidized."[14]  Issues and Decision Mem. at 12.

Commerce's use of the "reason to believe or suspect" standard is based on the legislative history for 19 U.S.C. § 1677b(c)(4): "Commerce "shall avoid using any prices which it has reason to believe or suspect may be dumped or subsidized prices."  Conf. Rep. at 590.  Regarding interpretation of the "reason to believe or suspect" standard, this Court has said:

> In attempting to define a similar phrase, "reasonable grounds to believe or suspect," which appears in 19 U.S.C. § 1677b(b)(1) (1999), this Court observed that "in order for reasonable suspicion to exist there must be 'a particularized and objective basis for suspecting' the existence of certain proscribed behavior, taking into account the totality of the circumstances, the whole picture." Therefore, the "reason to believe or suspect" standard at issue here must be predicated on particular, specific, and objective evidence.

*China Nat'l Mach.*, 264 F. Supp. 2d at 1239 (internal citations omitted).

---

[14]      In developing its methodology for selecting values for factors of production in NME situations, Commerce appears to have established a higher standard than would necessarily be required.  "The legislative history and recent Department determinations support the principal [sic] that we should disregard prices we have reason to believe or suspect *are* distorted by subsidies."  Issues and Decision Mem. at 10 (emphasis added).  When reaching its findings with respect to subsidization, Commerce stated that the evidence supports the conclusion: (1) that "it is reasonable to infer that all exports to all countries *are* subsidized," *Id*. at 11, and (2) that there is "particular and objective evidence to support a reason to believe or suspect that prices of the inputs from that country *are* subsidized." *Id*.  The legislative history relied upon to establish the reasonableness of its methodology, however, instructs Commerce to avoid prices "which it has reason to believe or suspect *may* . . . be subsidized." Conf. Rep. at 590 (emphasis added.)  Commerce apparently has concluded it should be held to this higher standard, and there is nothing to indicate that this decision is unreasonable.  That being the case, the court's analysis will be in accordance with the standard evident in Commerce's selected methodology.

Thus, "merging the two standards [the "reason to believe or suspect" standard used by Commerce with this Court's "substantial evidence" standard of review] . . . the court will accordingly affirm Commerce's actions if, given the entire record as a whole, there is substantial, specific, and objective evidence which could reasonably be interpreted to support a suspicion that the prices [Fuyao] paid to its market economy supplier were distorted." *Id*. at 1240. "[T]his court may not reweigh the evidence or substitute its own judgment for that of the agency. . . . [T]he agency is presumed to have considered all of the evidence in the record, and the burden is on the plaintiff to prove otherwise." *Id*. (internal citations omitted).

Commerce relies on evidence placed on the record by PPG to support its conclusion that there is "reason to believe or suspect" that prices from Korea, Thailand, and Indonesia were subsidized. The evidence concerning Korea includes various countervailing duty determinations stemming from subsidy programs in Korea; an excerpt from the U.S. Trade Representative's 2001 National Trade Estimate Report on Foreign Trade Barriers ("NTE Report") concerning Korea's export subsidy practices; excerpts from the World Trade Organization ("WTO") Trade Policy Review for Korea; and PPG's analysis of the foregoing evidence, purporting to show that prices for float glass imported into the PRC from Korea "are likely" subsidized. *See* Petitioners' Fact Submission Accompanying Petitioners' Factors Data, Conf. R. Doc. 92.

For Thailand, Commerce cites the foregoing documentation (albeit with respect to Thailand, not Korea), as well as news articles concerning a projected oversupply of glass in Thailand and tariff increases by Thailand's trading partners; a copy of an antidumping

investigation in New Zealand concerning float glass from Thailand; reports downloaded from the

Thailand Board of Investment ("BOI") Web site concerning incentives that are provided to BOI

Promoted Companies; a report referring to existing preferential tax arrangements for glass

makers; and WTO documents showing that South Africa and Australia maintain antidumping

duties on imports of float glass from Thailand.

For Indonesia, the evidence of subsidies includes four non-industry specific

countervailable export subsidies; an excerpt from the NTE Report for Indonesia; excerpts from

the 1998 WTO Trade Policy Review for dealing with Indonesian export subsidy practices; and

notifications by Thailand of duties in place for float glass from Indonesia.

In the Issues and Decision Memorandum, Commerce stated:

> We found that, where the facts developed in U.S. or third-country
> CVD findings include subsidies that appear to be used generally (in
> particular, broadly available, non-industry specific export
> subsidies), it is reasonable to infer that all exports to all markets
> from the investigated country are subsidized.  As we argued
> [previously] in the [tapered roller bearings] proceedings,[15] these
> prior CVD findings may provide the basis for the Department to
> also consider that it has particular and objective evidence to
> support a reason to believe or suspect that prices of the inputs from
> that country are subsidized.

Issues and Decision Mem. at 11.  Thus, Commerce insists that the record evidence supports two

findings: (1) that all exports from Korea, Thailand, and Indonesia are subsidized, and (2) that in

---

[15]     The tapered roller bearings proceedings were appealed in *China National Machinery Import & Export Corp. v. United States,* 27 CIT __, __, 264 F. Supp. 2d 1229, 1237–38 (2003).

particular, all exports of float glass from these countries are subsidized.[16]  Apparently, Commerce

believes that either finding supports its decision to resort to the use of surrogate values.

The court is not convinced that the various determinations and reports cited by Commerce

support either conclusion.  First, none of the more than 80 countervailing duty determinations

cited by Commerce concerning Korean subsidies involved float glass, the product at issue in this

case, nor for that matter did any of the countervailing duty determinations involve glass of any

kind.  Petitioners' Factors Data, Conf. R. Doc. 92, Ex. 1.  *See, e.g.*, *Luoyang Bearing Factory v.*

*United States*, 27 CIT __, __, 259 F. Supp. 2d 1357, 1364 (2003)  (emphasis in original)

(remanding on the grounds that, *inter alia*, "the various countervailing duty determinations relied

upon by Commerce *do not* include the hot-rolled bearing quality steel bar, the steel product at

issue in this case.").  The WTO report for Korea indicates only that "Korea has aggressively

promoted exports though a variety of policy tools," but does not indicate which exporters benefit

from such tools.  *Id*. Ex. 2.  Similarly, the NTE Report discusses several export loan and credit

programs, but does not indicate which sectors, producers, or products are eligible for such aid.

*Id*. Ex. 3.  This evidence, therefore, supports neither Commerce's conclusion that all Korean

exports are subsidized, nor its conclusion that float glass exports in particular are subsidized.

---

[16]     In its Final Determination, Commerce established a higher standard (i.e., that it should disregard prices it has reason to believe or suspect *are* distorted by subsidies) than that contemplated in the legislative history (that Commerce should disregard prices that *may be* subsidized).  *See supra* n.14.  In its brief, Commerce appears to recognize this, arguing that it "is not, in fact, determining from this evidence that the prices *are* subsidized as it would in a countervailing duty investigation, but rather that the information indicates that the prices *may be* subsidized."  Gov't Brief at 32 (emphasis added).  However, the Government may not now abandon the standard it adopted in the Final Determination for a lesser one.

In like manner, none of the more than 170 countervailing duty determinations cited by Commerce for Thailand concern any kind of glass. Petitioners' Factors Data, Conf. R. Doc. 92, Ex. 5. As to the other documentation for Thailand, the NTE Report indicates only that "Thailand's programs to support trade in certain manufactured products . . . may constitute export subsidies." *Id.* Ex. 6. Likewise, the WTO report for Thailand lists several financing schemes for exporters, but does not provide information as to restrictions on or qualifications for receiving such assistance. *Id.* Ex. 7. The antidumping duty investigation in New Zealand concludes that "some of the goods under investigation from Indonesia are being dumped, but the volume of dumped imports from Indonesia is negligible." *Id.* Ex. 9. As to the Thailand BOI incentives, they are available for several "priority areas" such as agriculture and public utilities, as well as for "targeted industries." However, none of the targeted industries listed appear to include the manufacture of float glass. *Id.* Ex. 14.

Finally, a report entitled, "Thailand: Construction Plans for $120,000,000 Glass Plant, Siam Cement Group (Thailand)" states that "existing preferential tax arrangements for glass makers are such that they must export 50% of their production output and, as a result[,] there is a product shortage." *Id.* Ex. 15. The report is dated 1995. The period of review for this investigation, however, is July 1, 2000, through December 31, 2000, and there is nothing to indicate that these tax arrangements were still in place at the time of this investigation. As with Korea, this evidence supports neither of Commerce's conclusions.

As to Indonesia, one of the countervailing duty determinations cited by Commerce

concerns extruded rubber thread, and all of the others concern apparel and textiles (luggage, handbags, gloves, and the like). Not one of the determinations concerns float glass. Moreover, most of the final determinations indicate that the investigation was terminated, or that the subsidy program at issue was not used by the producer under investigation. *Id*. Ex. 24. The NTE Report for Indonesia indicates that the export subsidies for "special exporters" (a term which is not defined) lapsed in 1999. *Id.* Ex. 25. Finally, the WTO report for Indonesia, which reviews exports subsidies and other promotion policies in that country, was completed in 1999, one year before the period of review for this investigation. *Id*. Ex. 17. Therefore, for Indonesia, too, the evidence supports neither of Commerce's findings.

In accordance with the standards established by its methodology, Commerce "must demonstrate particular, specific, and objective evidence to uphold its reason to believe or suspect that the prices [the plaintiff] paid the supplier for the inputs were subsidized." *China Nat'l Mach.*, 264 F. Supp. 2d at 1243. Here, none of the record evidence for Korea, Thailand, or Indonesia indicates whether the subsidy programs cited by Commerce are available to all exporters, or to float glass producers in particular, in the supplier countries. For example, evidence placed on the record by PPG regarding a Thai subsidy indicates that "each company must apply to the Board of Investment for a Certificate of Promotion (license), which specifies goods to be produced, production and export requirements, and benefits allowed. These license(s) are granted at the discretion of the Board. . . . " *Id*. Ex. 5. A similar Indonesian subsidy is also discretionary: "To whom and at what interest rates such [working capital export] credits are granted is at the discretion of the lending institution." *Id*. Ex. 24 (citing Certain

Textile Mill Prods. and Apparel From Indonesia, 49 Fed. Reg. 49,672, 49,674 (ITA Dec. 21, 1984) (prelim. determination)). Moreover, much of the evidence is outdated or simply inapplicable to the float glass industry (e.g., over 200 countervailing duty determinations for Korea and Thailand concerning products other than float glass). This case is similar to *China National Machinery*, in which the court noted that Commerce failed to provide information as to whether the subsidy program

> is offered across the board to all [producers] in the country, to those of a certain size, to those which manufacture a certain product or set of products, to those in a specific geographical area or so on . . . [or as to] who could benefit from the program or whether the companies may choose not to participate (for example, because the program comes with certain obligations).

*China Nat'l Mach.*, 264 F. Supp. 2d at 1241 (ordering Commerce, upon remand, to review and augment the administrative record and to explain its determinations).

The legislative history, which Commerce relies upon as a basis for the reasonableness of its methodology, indicates that Congress "[did] not intend for Commerce to conduct a formal investigation to ensure that such prices are not dumped or subsidized, but rather intend[ed] that Commerce base its decision on information generally available to it at that time." Conf. Rep. at 590–91. Nonetheless, using the standard Commerce has established, it must "point to particular and specific evidence" from which it would be reasonable to infer that subsidies were available to the float glass industry in Korea, Thailand, and Indonesia, and that "particular and specific evidence" supports a reason to believe or suspect that the float glass purchased by Fuyao was subsidized. *Luoyang Bearing Factory*, 259 F. Supp. 2d at 1364. Thus, on remand, Commerce

shall revisit this issue and, if it continues to find that (1) all exports from Korea, Thailand, and Indonesia are subsidized, or (2) that, in particular, exports of float glass from these countries are subsidized, it must provide specific and objective evidence to support these findings. Submission of such evidence "is consistent with the remedial, not punitive, purpose of the antidumping duty laws." *China Nat'l Mach.*, 264 F. Supp. 2d at 1242.

In addition, in reaching its findings Commerce must take into account Fuyao's claim that "every non-specific export subsidy program cited by [PPG] was found by Commerce either to be not in use or to confer only a *de minimis* benefit."[17] *See* Fuyao Mem. at 6. Fuyao further states that "[a]lthough Commerce did not dispute [Fuyao's] findings," *id.*, regarding the *de minimis* nature of the subsidy programs, it nonetheless determined that there was reason to believe or suspect that Fuyao's purchase prices from Korea, Thailand and Indonesia were subsidized. For its part, Commerce maintains that "the level of subsidization in a CVD finding on a certain product and certain exporters, whether de minimis or not, is irrelevant." Gov't Brief at 36 (citing Issues and Decision Mem. at 12). While Commerce may adopt any reasonable methodology to effect the purposes of the statute, it must articulate its reasons for the choices it makes. On remand, Commerce shall fully and completely explain why it would be reasonable to resort to surrogate values, rather than actual amounts paid, where any subsidization—even *de minimis*

---

[17]    The *de minimis* doctrine is applicable to all countervailing duty cases. *See Carlisle Tire & Rubber Co. v. United States*, 1 CIT 352, 354, 517 F. Supp. 704, 706 (1981). A weighted-average antidumping duty margin is *de minimis* if Commerce determines that it is less than 2% *ad valorem*. *See* 19 U.S.C. § 1673b(b)(3). Because "a *de minimis* benefit is, by definition, of no significance whatever," *Carlisle Tire & Rubber*, 1 CIT at 354, 517 F. Supp. at 706, companies with *de minimis* dumping margins are considered to have a dumping margin of zero.

subsidization—is present. In particular, Commerce shall explain how, if a subsidy is found to be *de minimis*, that subsidy would nevertheless rise to the level of a distortion[18] in prices that would justify Commerce's decision to depart from actual input prices. *See China Nat'l Mach.*, 264 F. Supp. 2d at 1241.

        C.        *Commerce's Determinations With Regard to Water as a Direct Input and "Stores and Spare Parts"*

        1.        *Water as a Direct Input*

Based on its observations during the verification process, Commerce determined that "[i]t is clear from the production process for windshields that water usage is significant and vital for cleaning the windshields prior to the 'sandwiching' of PVB [polyvinyl butyrl] in between the two panes of glass." Issues and Decision Mem. at 59. Citing past determinations in which it had assigned a separate surrogate value for water where its use was significant, Commerce assigned separate surrogate values for Fuyao's and Xinyi's water usage. *Id.*; *see also* Sebacic Acid From the P.R.C., 65 Fed. Reg. 49,537 (ITA Aug. 14, 2000) (final results); *see also* Freshwater Crawfish Tail Meat from the P.R.C., 66 Fed. Reg. 20,634 (ITA Apr. 24, 2001) (final results) and accompanying Issues and Decision Mem. at Comment 7 (valuing water as a factor of production because it is used in large quantities and for more than incidental purposes).

Fuyao argues that Commerce's decision to value water as a separate factor of production,

---

[18]        "The legislative history and recent Department determinations support the principal [sic] that we should disregard prices we have reason to believe or suspect are *distorted by subsidies*." Issues and Decision Mem. at 10 (emphasis added).

rather than as part of factory overhead, was in error, since the financial statement of the Indian

company Commerce chose as the surrogate, Saint-Gobain Sekurit ("St. Gobain"),[19] "must include

water in its factory overhead. . . . There is no record evidence to support a finding that the St.

Gobain financial statement does not include a cost for water. Therefore, it is only reasonable to

accept that water was not separated out from St. Gobain's overhead costs." Fuyao Mem. at

30–31. Fuyao argues that

> [t]o avoid double counting, when water is already included in
> factory overhead, the Department has a long-standing practice of
> either 1) not adding a separate value for water, or 2) excluding
> water costs from factory overhead. . . . [T]he record in this case
> indicates that the Saint Gobain annual report includes water in its
> factory overhead costs. Commerce has failed to provide a
> reasonable explanation of where it believes the St. Gobain
> financial [statement] includes water costs if they are not part of
> factory overhead.

*Id*. at 31–32.

Commerce responds that there was no potential to double-count water, because it "valued

the overhead using only the line-items 'depreciation', 'stores and spares consumed', and 'repairs

and maintenance' from St. Gobain's annual report. None of these line items would include the

input water." Gov't Brief at 47 (internal citation omitted). Commerce explained:

> "Depreciation" is defined as "the accounting process of allocating
> the cost of tangible assets to expense in a systematic and rational
> manner to those periods expected to benefit from the use of these
> assets." Also, Commerce has explained in other cases that the
> "stores and spare parts consumed" line-item in an Indian financial
> statement generally includes indirect materials, and not direct
> materials. And "repairs" are defined as "expenditures made to

---

[19]      No party disputes the use of St. Gobain as a source of surrogate values.

> maintain plant assets in operating condition. . . . Replacement of
> minor parts, lubricating and adjusting of equipment, repainting,
> and cleaning are examples of maintenance charges that occur
> regularly and are treated as ordinary operating expenses.

*Id*. (internal citations omitted).

Although the court finds it reasonable that water would not be included under "depreciation" or "repairs" as defined, the same cannot be said for the line item "stores and spare parts." Commerce argues that the "stores and spare parts" line item "generally includes indirect materials, and not direct materials," and that, since water is a direct material, it would not be included under this line item. Gov't Brief at 47. This reasoning, however, does not constitute substantial evidence that water is not already included in factory overhead. First, the amount allocated to "stores and spare parts" is sufficiently large to accommodate a significant input such as water.[20] Second, only "stores and spare parts" could arguably include water, since it is improbable that water would be included under "depreciation" or "repairs" as those line items have been defined.

In constructing normal value, "Commerce must capture all of the costs of production no matter how characterized." *Yantai Oriental Juice Co. v. United States*, 27 CIT __, __, slip op. 03-150 at 14 (Nov. 20, 2003). Since Fuyao is correct that there is no evidence that the St. Gobain financial statement did *not* capture water as part of factory overhead, Commerce is directed, on remand, to demonstrate that its decision to value water as a separate factor of production, rather

---

[20]     The line item "stores and spare parts" constitutes over one-quarter (26%) of total factory overhead.

than as part of factory overhead, does not result in impermissible double counting.

> 2.      *"Stores and Spare Parts"*[21]

Next, Fuyao objects to Commerce's inclusion of "stores and spare parts" in factory

overhead.  Fuyao argues that, since the St. Gobain financial statement's line item "Cost of

Materials Consumed" accounted only for the two main raw materials, float glass and PVB, "it is

obvious from the St. Gobain financial statements that other raw materials [such as mirror

buttons, antenna wires, nails, and screws] are included in 'stores and spare parts.'"  Fuyao Mem.

at 40–41.  Fuyao argues:

> When calculating the factory overhead ratio, the Department
> divided Saint Gobain's overhead costs (Depreciation + Stores and
> Spare Parts + Repairs and Maintenance) by Total Material Costs
> (Materials + Energy + Labor). . . .  However, . . . the overhead
> costs included other raw materials while the cost of materials only
> included the cots [sic] for PVB and float glass.  Accordingly, the
> Department divided an *inflated* total overhead cost (inclusive of
> other raw materials) by an *understated* total cost of materials
> (exclusive of the other raw materials), resulting in an artificially
> higher factory overhead ratio.

*Id*. at 41 (emphasis in original).

In the Issues and Decision Memorandum, Commerce stated that "[w]hile [Fuyao] does

demonstrate that the direct material costs in direct materials only includes float glass and PVB,

there is no evidence on the record that these other direct materials are included under stores and

---

[21]      Xinyi also disputes Commerce's determination with regard to this issue.  Because
Xinyi's arguments are substantially the same as Fuyao's, they are not addressed separately in the
court's analysis.

spare parts." Issues and Decision Mem. at 55. Here again, Commerce argues that overhead

represents the indirect manufacturing costs that a company incurs, and that "the 'stores and spare

parts consumed' line item on a financial statement is included as a miscellaneous part of

overhead, and generally includes indirect materials, and not direct materials consumed in the

production process." Gov't Brief at 65 (internal citation omitted). Thus, Commerce argues that

the additional materials used to make the Windshields could not be included in "stores and spare

parts," since that line item contains only indirect materials, not direct materials such as the

additional materials at issue here.


In support of its argument, Fuyao cites several cases in which Commerce determined that

raw materials, not included in direct materials, were part of factory overhead. In Certain

Preserved Mushrooms from the P.R.C., 63 Fed. Reg. 72,255, 72,265 (Dec. 31, 1998) (final

determination), Commerce concluded that since the raw materials used in the production of

canned mushrooms, such as salt, water, chlorine, and ascorbic acid, were not included under

"raw materials" along with the two *main* raw materials (mushroom growing costs and cans), "we

are including the valuation of all factors other than mushrooms and containers in factory

overhead." *Id.* Commerce has cited Mushrooms from the P.R.C. for this reasoning in other

cases as well:

> [I]n Mushrooms from the PRC, we found that the factory overhead
> ratio calculated using the surrogate's financial statement appeared
> to include the costs for several raw materials included in the
> category "consumables." Because these materials were already
> included as part of factory overhead, in that case the Department
> did not value these materials separately, thereby avoiding double-
> counting.

Solid Agricultural Grade Ammonium Nitrate from Ukraine, 66 Fed. Reg. 38,632 (July 25, 2001)

(final determination) (Issues and Decision Mem. at Comment 6).

With respect to the St. Gobain financial statement, Fuyao argues that because the

additional materials are not included under "raw materials" along with float glass and PVB film,

the only rational place for these materials to be included is within factory overhead, under the

line item stores and spare parts. *See* Fuyao Mem. at 40–41. As with its arguments with respect

to water as a direct input *supra*, Commerce argues that the stores and spare parts line item on a

financial statement "generally includes *indirect* materials, and not direct materials consumed in

the production process." Gov't Brief at 65 (citing Indus. Nitrocellulose From the P.R.C., 62 Fed.

Reg. 65,667, 65,671–72 (ITA Dec. 15, 1997) (final results) (emphasis added)). Thus, Commerce

argues that it was reasonable for it to conclude that the "stores and spare parts consumed" line

item included only indirect materials, "consistent with its normal practice." Gov't Brief at 65.

Having thus concluded, Commerce argues that its decision to include "stores and spare parts" in

its calculation of factory overhead was also reasonable. *Id*. at 67.

By this argument, Commerce acknowledges that the additional materials used in the

production of the Windshields are in fact direct materials. The record supports the finding that

only float glass and PVB film—and none of the additional direct materials, such as mirror

buttons, antenna wires, nails, or screws—are included under "raw materials." It is therefore

reasonable to conclude that the additional raw material expenses are included elsewhere in the St.

Gobain financial statement.

Here, Commerce has simply failed to demonstrate that the St. Gobain financial statement did not capture all of the factors of production; i.e., that these financials did not, in fact, represent the entire cost of producing the product and that therefore they must be added in. It is not sufficient for Commerce to conclude, without more, that since the stores and spare parts line item generally includes indirect materials, it may not *also* include the additional direct materials at issue here. This is particularly the case given Commerce's history of inconsistent application of this reasoning. Accordingly, Commerce is instructed, upon remand, to provide an explanation as to where these additional materials are valued in St. Gobain's financial statement, if they are not part of stores and spare parts.

D.      *Commerce's Determination With Regard to the St. Gobain Profit Figures*

Title 19 U.S.C. § 1677b(c)(1) directs Commerce to "determine the normal value of the subject merchandise on the basis of the value of the factors of production . . . to which shall be added an amount for general expenses and profit plus the cost of containers, coverings, and other expenses." *Id*. To calculate the profit ratio[22] in this case, Commerce included only positive profit figures, disregarding any negative profit figures. Thus, Commerce disregarded the financial data from the Indian surrogate, St. Gobain, since that company had a negative profit, and instead used the financial data from another surrogate, Asahi India Safety Glass, Ltd. ("Asahi").

---

[22]     The profit ratio is determined by dividing profit by cost of production or manufacture ("COP"). The value for profit is arrived at by multiplying the profit ratio by the sum of the cost of manufacture and SG&A expenses. *See* Titanium Sponge From the Russian Federation, 64 Fed. Reg. 1599, 1601 (ITA Jan. 11, 1999) (final results).

In doing so, Commerce relied upon language contained in the Statement of Administrative Action, accompanying the Uruguay Round Agreements Act, H.R. Rep. No. 103-826(I), at 839–40 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4175 ("SAA").[23] The SAA states: "Unlike current practice, under section 1677b(e)(2)(A) [relating to calculating constructed value], in most cases Commerce would use profitable sales as the basis for calculating profit for purposes of constructed value." *Id*. at 840.

Fuyao objects to Commerce's reliance on language from the SAA on the grounds that it applies only to the new provisions under the URAA for calculating constructed value ("CV") in market economy cases, and that this methodology is "solely . . . the 'preferred' CV profit methodology codified under 19 U.S.C. § 1677b(e)(2)(A)."[24] Fuyao Mem. at 27. Because China

---

[23] The SAA is "an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and this Act in any judicial proceeding in which a question arises concerning such interpretation or application." 19 U.S.C. § 3512(d) (2000).

[24] When calculating CV for imported merchandise, where actual data is available, 19 U.S.C. § 1677b(e)(2)(A) directs Commerce to use:

> (1) the cost of materials and fabrication or other processing of any kind employed in producing the merchandise, during a period which would ordinarily permit the production of the merchandise in the ordinary course of business; [or]

> (2) the actual amounts incurred and realized by the specific exporter or producer being examined in the investigation or review for selling, general, and administrative expenses, and for profits, in connection with the production and sale of a foreign like product, in the ordinary course of trade, for consumption in the foreign country . . . .

19 U.S.C. § 1677b(e)(2)(A).

is an NME country, however, Fuyao argues that Commerce's methodology in the instant case is "completely irrelevant to this proceeding since the profit ratio is not being calculated using [Fuyao's] own home market sales," but rather the sales of the Indian surrogate(s). *Id.*

Because the statute refers only to "an amount" for profit and is silent with respect to how it should be calculated, the court will review Commerce's interpretation for reasonableness. *See, e.g.*, *Rhodia, Inc. v. United States*, 26 CIT __, __, 240 F. Supp. 2d 1247, 1252 (2002) ("Because the statute is ambiguous, we review Commerce's interpretation to determine whether it is reasonable.").

This Court has noted that "Commerce has been excluding zero profits in market economy cases since 1997 . . . and slowly began to apply this methodology to nonmarket economies." *Rhodia*, 27 CIT at __, 240 F. Supp. 2d at 1253. The court in *Rhodia* explained:

> In making [a] profit calculation, the SAA allows Commerce to "ignore sales that it disregards as a basis for normal value, such as those disregarded because they are made at below-cost prices." As the SAA explains, "in most cases Commerce would use profitable sales as the basis for calculating profit for purposes of constructed value." Furthermore, "sales at a loss are consistently rejected, both as a basis for normal value (19 U.S.C. § 1677b(b)) and as a basis for constructed value. (19 U.S.C. § 1677b(e))."

*Id.* at 1254 (internal citations omitted).

In Certain Fresh Cut Flowers From Ecuador, 64 Fed. Reg. 18,878 (ITA Apr. 16, 1999) (prelim. results) ("Flowers From Ecuador"), Commerce disregarded the financial statements of

producers that incurred losses in order to derive an "element of profit" as contemplated by the

SAA. This determination—that the SAA clearly contemplates that normal value includes an

element of profit—was applied again in Silicomanganese from Brazil, 62 Fed. Reg. 37,869 (July

15, 1997) (final results). There, Commerce stated that "[t]he presumption that normal value

includes an element of profit is so strong that the post-URAA statute directs us to use one above-

cost home market sale as the basis for normal value, even if hundreds of other sales have below-

cost prices." *Id*. at 37,877.

In Steel Concrete Reinforcing Bars From the P.R.C., 66 Fed. Reg. 33,522 (ITA June 22,

2001) (final determination), Commerce explained that it found it appropriate to extend the

practice of excluding losses in the calculation of profit for market economy producers to

nonmarket economy producers. In the Issues and Decision Memorandum accompanying that

determination, Commerce stated:

> Although in some past cases we have averaged in a loss as zero
> profit, we believe a better approach is found in [Flowers From
> Ecuador], which disregards financial statements showing a loss for
> purposes of calculating the profit component of constructed value
> under Section 773(e)(2) of the Act in market economy cases. *The
> same principles applied in* Flowers From Ecuador *are reasonably
> applied in a nonmarket economy case.*

Issues and Decision Mem. at Comment 8 (emphasis added).

Based on the foregoing, the court finds reasonable Commerce's interpretation of the term

"profit" to include only positive amounts. The court agrees with the reasoning in *Rhodia*, that

sales made below cost may be disregarded when calculating profit:

> Because negative losses are often rejected and ignored for normal value, based on the clear expression of legislative intent contained within the SAA, Commerce's decision to exclude them from the profit ratio is a reasonable extension of this policy.

*Rhodia*, 240 F. Supp. 2d at 1254; *see also Pesquera Mares*, 266 F.3d at 1382 ("[S]tatutory interpretations articulated by Commerce during its antidumping proceedings are entitled to judicial deference under *Chevron*."); *Chevron*, 467 U.S. at 844 ("[A] court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency.").

Having concluded that Commerce was reasonable in including only positive profits in its calculations, the court turns to Fuyao's next two claims. Noting that "Commerce believes that the calculation of profit ratios in NME cases should be guided by the principles established under the CV profit provisions," Fuyao advances two alternative arguments based on the language of 19 U.S.C. § 1677b(e)(2)(B).[25]  Fuyao Mem. at 28.  Fuyao first argues that the third alternative

---

[25]     Title 19 U.S.C. § 1677b(e)(2) states that the constructed value of imported merchandise shall be an amount equal to the sum of:

> (A) the actual amounts incurred and realized by the specific exporter or producer being examined in the investigation or review for selling, general, and administrative expenses, and for profits, in connection with the production and sale of a foreign like product, in the ordinary course of trade, for consumption in the foreign country, or
>
> (B) [i]f actual data are not available with respect to the amounts described in subparagraph (A), then [the CV of imported merchandise shall include amounts equal to]—
>
> > (i) the actual amounts incurred and realized by the specific exporter or producer being examined in the

method for determining the CV, found in 19 U.S.C. § 1677b(e)(2)(B)(iii), which permits

Commerce to calculate CV profit "based on any other reasonable method," does not require that

profit be calculated only on sales "in the ordinary course of trade." Fuyao Mem. at 28. Fuyao

states:

> This [ordinary course of trade] criterion is specified for the second
> alternative CV profit method, but it is not required of the first or
> third alternative methods. Thus, this [third] provision does not
> support Commerce's decision to disregard the St. Gobain's profit
> figure on the assumption that the sales are outside the ordinary
> course of trade.

---

> investigation or review for selling, general, and
> administrative expenses, and for profits, in
> connection with the production and sale, for
> consumption in the foreign country, of merchandise
> that is in the same general category of products as
> the subject merchandise,
>
> (ii) the weighted average of the actual amounts
> incurred and realized by exporters or producers that
> are subject to the investigation or review (other than
> the exporter or producer described in clause (i)) for
> selling, general, and administrative expenses, and
> for profits, in connection with the production and
> sale of a foreign like product, in the ordinary course
> of trade, for consumption in the foreign country, or
>
> (iii) the amounts incurred and realized for selling,
> general, and administrative expenses, and for
> profits, based on any other reasonable method,
> except that the amount allowed for profit may not
> exceed the amount normally realized by exporters or
> producers (other than the exporter or producer
> described in clause (i)) in connection with the sale,
> for consumption in the foreign country, of
> merchandise that is in the same general category of
> products as the subject merchandise . . . .

19 U.S.C. § 1677b(e)(2)(A)–(B).

*Id*.


Fuyao is correct that Commerce is not statutorily required to use only sales made in the ordinary course of trade in its calculations. Because the court has determined that Commerce's decision to disregard negative profit amounts was a reasonable interpretation of the language of the statute in light of the language of the SAA, however, it necessarily follows that Fuyao's argument must fail.


Fuyao next argues that under this third alternative method for calculating the CV profit, the amount of such profit "may not exceed the amount normally realized" by other producers and exporters. Fuyao Mem. at 28 (citing 19 U.S.C. § 1677b(e)(2)(B)(iii)). Thus, Fuyao reasons that because the Asahi profit was the highest profit amount of any Indian company on the record, as Commerce acknowledges, "the use of the Asahi profit figure alone would be in direct violation of the statute's guidelines." *Id*.


As previously noted, the court defers to Commerce's reasonable interpretation of the term "profit" as used in 19 U.S.C. § 1677b(e)(2)(A). The court is not convinced, however, that in developing its methodology Commerce took fully into consideration the direction in 19 U.S.C. § 1677b(e)(2)(B)(iii), that the constructed value of imported merchandise

> shall be a sum equal to the amounts incurred and realized for selling, general, and administrative expenses, and for profits, based on any other reasonable method, *except that the amount allowed for profit may not exceed the amount normally realized by exporters or producers* (other than the exporter or producer

> described in clause (i)) in connection with the sale, for
> consumption in the foreign country, of merchandise that is in the
> same general category of products as the subject merchandise . . . .

19 U.S.C. § 1677b(e)(2)(B)(iii) (emphasis added).

On remand, Commerce shall fully explain how its chosen methodology complies with the

statute.  In particular, Commerce shall explain why, given that the Asahi profit amount was the

highest profit amount of any Indian company on the record, the use of the Asahi profit figure

alone complies with the statute's provisions.

E.     *Commerce's Determination With Regard to the "Purchase of Traded Goods" in the Denominator for the SG&A Ratio*

    1.     *Fuyao*

"Traded goods" are products that are purchased and then resold by a company.  *See*

*Timken Co. v. United States*, 23 CIT __, __, 59 F. Supp. 2d 1371, 1379 (1999).  Here, Commerce

calculated Fuyao's normal value

> by totaling the sums of COM [cost of manufacture], overhead,
> profit and packing, and SG&A.  In calculating SG&A, Commerce
> included, *inter alia*, manufacturing, administrative, and selling
> expenses less energy and labor costs.  Because the record of this
> review lacked adequate information regarding whether the traded
> goods purchased by St. Gobain affected the cost of manufacture,
> Commerce properly excluded St. Gobain's "purchase of traded
> goods" from the SG&A ratio.[26]

---

[26]     SG&A are the general expenses related to the cost of manufacturing.  *Magnesium Corp. of Am. v. United States*, 20 CIT 1092, 1104, 938 F. Supp. 885, 898 (1996).  SG&A includes labor, materials, factory overhead, and energy costs.  *See FMC Corp. v. United States*, 27 CIT __, __, slip. op. 03-15 at 4 (Feb. 11, 2003).  The SG&A ratio is multiplied by the cost of manufacture in order to obtain the amount of SG&A expenses.  *See* Titanium Sponge From the

Gov't Brief at 67 (internal citations omitted).

At the administrative level, Fuyao acknowledged that the costs associated with the purchase of these goods should not be included in the denominator for the factory overhead ratio because "the purchase of traded goods is not relevant to St. Gobain's *production* operations." Fuyao Mem. at 33 (emphasis in original). However, Fuyao reasoned that

> the purchase and resale of traded goods generates *selling and administrative* expenses that have already been included in the numerator of the SG&A calculation. Therefore, Commerce would overstate the SG&A ratio if it failed to include the cost of acquiring these traded goods as part of the SG&A denominator.

*Id*. (emphasis added). With respect to these expenses, Fuyao states:

> [U]sing selling and administrative expenses that the record indicates include expenses for the purchase and resale of traded goods as part of the SG&A ratio numerator without including the acquisition cost of these same traded goods in the denominator plainly distorts the resulting SG&A ratio.

*Id*. at 34.

For its part, Commerce maintains that

> [a]lthough [Fuyao] seemingly acknowledges Commerce's above-cited conclusion [that St. Gobain's financial statements do not provide evidence as to the location of expenses associated with the purchase of traded goods], [Fuyao] repeatedly argues that "record evidence supports the conclusion" that costs associated with the purchase of traded goods are part of St. Gobain's reported SG&A amount. . . . However, Commerce cannot find, nor has [Fuyao] specifically pointed to[,] any such "record evidence."

Russian Federation, 64 Fed. Reg. at 1601.

Gov't Brief at 68.

Fuyao disputes Commerce's conclusion that there is no evidence that the selling and administrative expenses associated with "purchase of traded goods" are included in the SG&A expenses listed in the St. Gobain financial statement. Fuyao states:

> Nowhere does Commerce allege that the purchase and resale of traded goods does *not* incur selling and administrative costs. Thus, Commerce implicitly acknowledges that the selling and administrative expenses related to the purchase and resale of traded goods must be included in the financial statement *somewhere*. Since there is no indication that these other selling and administrative expenses have been separately reported in the financial statement (*e.g.*, a separate line item described as "administrative expenses for traded goods"), record evidence supports the conclusion that expenses related to the purchase and resale of traded goods are part of the company's reported SG&A amount.

Fuyao Mem. at 34 (emphasis in original).

This Court has consistently rejected determinations by Commerce that include the costs related to the purchase and resale of traded goods in the denominator of the SG&A ratio when Commerce could not show how expenses related to these goods affected production of the subject merchandise. *See, e.g.*, *Rhodia*, 185 F. Supp. 2d at 1357 (granting Commerce's request for a voluntary remand to remove expenses related to traded goods from the denominator for the calculation of the overhead ratio); *see also Timken*, 23 CIT at __, 59 F. Supp. 2d at 1379 (remanding to Commerce to exclude purchases of traded goods from SG&A, since it "failed to demonstrate how these already manufactured goods constitute a material cost incurred in

manufacturing the subject merchandise."); *Luoyang Bearing Factory v. United States*, 26 CIT __, __, 240 F. Supp. 2d 1268, 1305 (remanding to Commerce to "exclude 'consumption of traded goods' from Commerce's overhead, SG & A and profit rate calculations and to recalculate the dumping margins accordingly . . . ."). In like manner, any amount of selling and administrative costs related to such goods should be excluded from the ratio's numerator.

Here, both Commerce and Fuyao acknowledge that there is insufficient evidence to determine where expenses associated with the purchase of traded goods are accounted for in St. Gobain's financial statement. *See* Fuyao Mem. at 34; Gov't Brief at 67. On remand, Commerce shall correct the calculation of the SG&A ratio by either (1) eliminating expenses relating to the purchase of traded goods from the numerator, (2) including costs relating to the purchase of traded goods in the denominator, or (3) developing some other reasonable method for taking traded goods into account.

        2.      *PPG*

PPG complains that Commerce's calculations of the SG&A, FOH, and profit values were flawed by using ratios derived from the actual costs found in the financial statements of two Indian producers[27] and applied "to the values assigned to the Chinese respondents' Factors of Production (FOP) . . . ." PPG Mem. at 4. PPG's argument is essentially one of apples and oranges. That is, PPG insists that the values must be distorted if they purport to accurately

---

[27]     The two Indian producers were St. Gobain and Asahi. The former's financials were used to calculate SG&A and FOH; the latter's were used to calculate profit.

represent the values for SG&A, FOH, and profit since they are calculated using ratios derived from the Indian producers' actual experience that were applied to FOP values for float glass and PVB developed by Commerce. In order to correct this distortion

> [i]n the underlying investigation, [PPG] had proposed a methodology that would have permitted [Commerce] to calculate values for overhead, SG&A[,] and profit by allocating the Indian producer's overhead and SG&A expenses to the consumption of its two key raw materials – float glass and PVB. This approach would have produced fixed, quantity-based rates for FOH and SG&A in terms of dollars per square meter of float glass and PVB consumed. [Commerce] could have then applied those rates to the Chinese producers' consumption of float glass and PVB.

*Id*. at 39–40. Commerce declined to adopt this approach reasoning:

> Petitioners' proposed methodology would only factor in the raw material usage of float glass and PVB. While the Department recognizes that these two inputs constitute the majority of the raw materials consumed to manufacture [W]indshields, other direct inputs cannot be ignored. Direct inputs other than float glass and PVB are almost always included in [W]indshields (ink, mirror buttons, etc). The Department finds it is better to calculate ratios based on all direct costs, as opposed to Petitioners' methodology, which takes into account only quantities of float glass and PVB.

Issues and Decision Mem. at 38–39

Having failed to convince Commerce to adopt its proposed methodology in the underlying investigation, PPG, for the first time, proposes another approach:

> [PPG does] not contest the use of the Indian producer's annual report as the starting point to derive values for FOH, SG&A and profit, or even using ratios. What Plaintiffs contest is [Commerce's] failure to adjust the ratios to account for certain identifiable differences [which it claims it has identified, between the actual experience of the Indian producers and the values for the factors of production developed by Commerce]. Considering the

> FOP values selected by [Commerce], a more representative ratio that still would have reflected the Indian producer's actual FOH and SG&A experience, as mandated by the statute . . . [Under PPG's new proposal] the numerator for the ratio, which comes from the [St. Gobain] annual report, continues to reflect the actual FOH and SG&A experience of the surrogate Indian producer during the period covered by the report. The denominator is adjusted to account for identifiable differences in materials, energy and labor in the values selected by [Commerce] for the Chinese FOP.

PPG Mem. at 37–38.

PPG believes that it is entitled to present this methodology to the court, without having advanced it to Commerce at the administrative level because Commerce, in rejecting its proposed methodology in the underlying investigation, did not adequately address its distortion argument. PPG Mem. at 42 ("While [Commerce] provided an explanation for why it did not use the methodology proposed by Plaintiffs, nowhere does [Commerce] address the *underlying issue* of the distortions caused by using cost-based ratios for FOH, SG&A and profit, even though the question was plainly raised by Plaintiffs.") (emphasis in original).

The situation here is similar to *Timken Co. v. United States*, 25 CIT __, __, 166 F. Supp. 2d 608, 625 (2001), where the Court said:

> "Commerce attempted to capture in its rate calculation the surrogate company's experience in incurring overhead and SG&A expenses," and created a reasonable internally consistent ratio that does not violate the boundaries set by 19 U.S.C. § 1677b(c) (1994). The fact that one of the actual parameters is likely to be higher while the other one is likely to be lower than the corresponding data derived from the records of [the subject producer] means that neither Commerce's methodology shall be deprived of this Court's

> deference, nor does it constitute sufficient grounds for the Court to
> uphold Timken's suggestion as a more palatable alternative.

*Id.* (citing *Am. Spring Wire Corp. v. United States*, 8 CIT 20, 22, 590 F. Supp. 1273, 1276

(1984)); *Am. Spring Wire*, 8 CIT at 22, 590 F. Supp. at 1276 ("The court may not substitute its

judgment for that of the [agency] when the choice is 'between two fairly conflicting views, even

though the court would justifiably have made a different choice had the matter been before it *de*

*novo* . . . .'" (internal citations omitted)).


While having some attraction for its apparent consistency, PPG's argument must fail.

First, while complaining of Commerce's methodology, PPG has failed to demonstrate that

applying the ratios to the Indian producer's actual costs will provide a more accurate picture than

applying the ratio to the FOPs found by Commerce.  This is particularly relevant because the goal

is to establish the costs for each individual Chinese company.  The FOPs established by

Commerce are designed to be surrogates for these costs.  Thus, it is difficult to see how PPG's

applying the ratios to St. Gobain's and Asahi's actual costs would be a more accurate reflection

of these values.  In addition, by failing to offer their methodology to Commerce at the

administrative level, PPG cannot raise it for the first time here.  "The exhaustion doctrine

requires a party to presents its claims to the relevant administrative agency for the agency's

consideration before raising these claims to the Court."  *Fabrique de Fer de Charleroi S.A. v.*

*United States*, 25 CIT __, __, 155 F. Supp. 2d 801, 805 (2001) (citing *Unemployment Comp.*

*Comm'n of Alaska v. Aragon*, 329 U.S. 143, 155 (1946)); *Unemployment Comp. Comm'n of*

*Alaska*, 329 U.S. at 155 ("A reviewing court usurps the agency's function when it sets aside the

administrative determination upon a ground not theretofore presented and deprives the [agency] of an opportunity to consider the matter, make its ruling, and state the reasons for its action.").

As in *Timken*, PPG has simply not demonstrated that its proposed resolution is any more accurate than the usual method used by Commerce. That being the case, the court defers to Commerce's selection of methodology.

F.        *Commerce's Determination With Regard to Ocean Freight Averages*

Fuyao used both NME and market economy freight carriers to ship its Windshields to the United States. In order to allow Commerce to use the cost of the market economy freight carriers even when Fuyao used NME carriers, Fuyao calculated a weighted-average freight cost to each U.S. delivery destination using only those market economy shipments that approximated the NME carrier shipments by region, state, city, or zip code. *See* Fuyao Mem. at 35.

Commerce, however, decided to use these weighted-average prices only when the average market economy price exactly matched the zip code of the NME shipment destination. Where the zip codes did not match, Commerce used a surrogate value for shipments to that area. *See* Issues and Decision Mem. at 45.

Fuyao argues that Commerce should apply the freight rates Fuyao paid to market economy shippers to all of Fuyao's NME shippers, regardless of destination. *See* Fuyao Mem. at 37. Fuyao argues that under *Shakeproof*, the actual price paid for any input is the best available

information to value that factor of production. *See Shakeproof*, 268 F.3d at 1382 ("Where we can determine that a [non-market economy] producer's input prices are market determined, accuracy, fairness, and predictability are enhanced by using those prices.") (citing *Lasko*, 43 F.3d at 1446). Fuyao further argues that in *Peer Bearing Co. v. United States,* 25 CIT __, 182 F. Supp. 2d 1285 (2001), the court determined that Commerce acted reasonably in "utilizing actual prices paid in market economy currencies to market economy suppliers to value the entire FOP" and that Commerce "has applied this practice consistently in recent years." *Id.* at 1314, 1312.

Commerce has broad authority to interpret the antidumping statute. *Sigma,* 117 F.3d at 1405. "The critical question is whether the methodology used by Commerce . . . establishes antidumping duty margins as accurately as possible." *Shakeproof*, 268 F.3d at 1382. Here, Commerce chose not to use Fuyao's market economy freight costs to value NME carrier shipments because those shipments to non-matching zip codes did not reflect the distance involved in the shipment. Because distance affects the cost of freight, Commerce determined that using freight purchases that were not based on distance would result in inaccurate values for the freight costs. *See* Gov't Brief at 40 ("The fact that distance affects the cost of freight is also evidenced by actual freight providers' rate schedules which are set by distance and weight.") (citing FOP Valuation Mem. for Final Determination, Pub. R. Doc. 282).

Fuyao relies on past Commerce determinations to support its argument that Commerce utilizes market economy carrier rates for all ocean freight shipments. *See, e.g.*, Heavy Forged Hand Tools From the P.R.C., 67 Fed. Reg. 57,789, 57,792 (ITA Sept. 12, 2002) (final results);

*see also* Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From the P.R.C.,

66 Fed. Reg. 35,937, 35,940 (ITA July 10, 2001) (prelim. results) ("[W]hen some or all of a

specific company's ocean freight was provided directly by market economy companies . . . we

used the reported market economy ocean freight values for all U.S. sales made by that

company."). The cases Fuyao cites, however, do not address the issue of valuing NME carrier

destinations with different market carrier destination rates.[28] For example, record evidence

indicates that price variances occur when shipping from a port to different zip codes within a

state. *See* FOP Valuation Mem. for Final Determination, Conf. Rec. Doc. 121. Therefore,

Commerce's decision to value carrier shipments by destination-specific values was reasonable,

given that ocean freight costs are influenced by distance. *See, e.g.*, *Shakeproof Assembly*

*Components, Div. of Ill. Tool Works, Inc. v. United States*, 23 CIT __, __, 59 F. Supp. 2d 1354,

1358 (1999) ("Whether Commerce's use of imported prices to value an entire factor of

production is reasonable is inextricably linked to whether the methodology promotes accuracy.")

(internal citation omitted).

---

[28]     Rather, Fuyao argues that

> [i]n no other case has the Department required that the surrogate
> ocean freight match "exactly" the NME destination. On the
> contrary, the surrogate ocean freight rates are averages or rough
> approximates because the Department generally uses an average
> surrogate rate for the East Coast and the West Coast. If the
> Department is concerned about an exact match in terms of
> *destination*, specificity and contemporaneity, [Fuyao's] significant
> market-economy shipment rates are unquestionably far superior in
> all respects than the surrogate used by the Department.

Fuyao Mem. at 39 (emphasis in original).

For its part, PPG does not challenge Commerce's decision to use surrogate values for NME ocean freight. Rather, PPG argues that Commerce used the wrong shipping rate in its calculations with respect to Fuyao. Specifically, PPG contends that instead of using the Maersk Sealand ocean freight rates that were contemporaneous with the period of investigation, Commerce erred by using a rate from a 1997 Federal Maritime Commission report. *See* PPG Mem. at 8.

However, the values urged by PPG appear to have been tainted by the inclusion of charges for "PRC Arbitraries." *See* Petitioners' Surrogate Data, Pub. R. Doc. 332, Ex. 19. These "PRC Arbitraries" appear to be non-market shippers who transport cargo for a portion of the trip from Fuzhao, China to the United States. *See id.* As such, a part of each rate quoted by Maersk Sealand represents shipping performed by a non-market provider at non-market rates. As a result, Commerce had sound reason for preferring the Federal Maritime Commission rates to those proposed by PPG. *See Nation Ford Chem. Co. v. United States*, 21 CIT 1371, 1374, 985 F. Supp. 133, 135 (1997) (Commerce should "avoid surrogate values tainted by nonmarket forces.").

G.      *Commerce's Determination With Regard to the Surrogate Value of Electricity*

PPG argues that Commerce should have used, as a surrogate value, the average electricity rate from the financials of three producers[29] of Windshields, rather than the aggregate country-

---

[29]      PPG notes that St. Gobain, Asahi, and a third producer, Atul Glass Industries Ltd., accounted for nearly 70% of the total Indian auto glass market. PPG Mem. at 27.

wide rate that Commerce alternatively employed. PPG claims that use of these rates "that are more specific to the industry in the surrogate country actually producing the subject merchandise will yield more accurate dumping margins than will country-wide aggregate rates that reflect usage by a range of industries, most of which are completely unrelated to the subject merchandise." PPG Mem. at 27. As an initial matter PPG makes no showing tending to suggest that electric rates are somehow industry-specific in India. In addition, as PPG concedes, it is normal practice for Commerce to use the country-wide electricity rate as a surrogate. *See* PPG Mem. at 25 ("[Commerce] has typically used country-wide values to value energy inputs such as electricity in NME cases . . . ."). PPG claims, however, that the situation here is similar to that in Certain Preserved Mushrooms from the P.R.C., 65 Fed. Reg. 66,703 (ITA Nov. 7, 2000) (prelim. results of first new shipper review and first antidumping duty administrative review), where Commerce used the average rate of electricity costs of mushroom producers. In the Preliminary Results Valuation Memorandum, Commerce said:

> We have selected the average rate of the above-named mushroom producers rather than the Aggregate Methodology rate because the former rate is specific to the industry producing the subject merchandise and more contemporaneous to the POR than the Aggregate Methodology rate, which relies on data from 1995 through 1997. Based on our knowledge of the Indian preserved mushroom industry through our conduct of the concurrent antidumping proceeding on preserved mushrooms from India, we have determined that there are 12 known producers of preserved mushrooms in India. The four companies for which we calculated an electricity rate thus account for a substantial segment of the industry. Further, preserved mushrooms production occurs in only a few areas in India. This situation differs from that in other recent cases in which the Aggregate Methodology was applied, where the size and *location* of the Indian industry was not known to the same extent.

Prelim. Results Valuation Mem., Pub R. Doc. 259 at 8 (emphasis added).

Commerce, however, distinguished the situation here from that in Certain Preserved Mushrooms. "The Department established a practice of using a simple average of country-wide Indian state electricity rates as a surrogate value for Chinese electricity rates unless a party has shown that a company can be located only in a specific state . . . ." Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From the P.R.C., 63 Fed. Reg. 63,842, 63,856 (ITA Nov. 17, 1998) (final results) ("Tapered Roller Bearings") (citing Manganese Metal From the P.R.C., 63 Fed. Reg. 12,440, 12,446 (ITA Mar. 13, 1998) (final results); Polyvinyl Alcohol From the P.R.C., 61 Fed. Reg. 14,057, 14,062 (ITA Mar. 29, 1996) (final determination); Sulfanilic Acid From the P.R.C., 62 Fed. Reg. 25,917, 25,919 (ITA May 12, 1997) (prelim. results); and Chrome-Plated Lug Nuts From the P.R.C., 63 Fed. Reg. 31,719, 31,722 (ITA June 10, 1998) (prelim. results). In Tapered Roller Bearings, Commerce noted:

> Electricity prices are subject to a number of influences specific to the location of the plant. These include: local market conditions, state intervention, methods of transmission, distribution of power generation and privatization. *Simply put, there are more variables to consider and weigh than the location of the industry because of the nature of the electricity industry in India.* Thus, it is fair and reasonable to use a simple average for large industries in all Indian states as a surrogate value for electricity rates.

63 Fed. Reg. at 63,856–57.

The court agrees that PPG has failed to show a compelling reason for Commerce to have deviated from its usual practice of using the country-wide electricity rate. This is particularly the

case because, unlike Certain Preserved Mushrooms, there is no evidence that Indian float glass producers are concentrated in one geographical area. Thus, because Commerce used its usual methodology, and because there is no evidence to suggest that the experience of the Indian glass producers was somehow unique with respect to electricity, or that their actual costs should be preferred over the country-wide cost, Commerce's decision is sustained.

CONCLUSION

On remand, Commerce shall revisit the evidence cited for its various findings and satisfy its obligations with specific reference to the evidence it claims supports its conclusions and adequate explanations of its findings based on this evidence. The ITC shall also address the record evidence which "fairly detracts" from the weight of the evidence supporting the ITC's determination. Remand results are due within ninety days of the date of this opinion, comments are due thirty days thereafter, and replies to such comments eleven days from their filing.

                                          /s/ Richard K. Eaton
                                          Richard K. Eaton, Judge


Dated: December 18, 2003
        New York, New York

**ERRATA**

*Fuyao Glass Industry Group Co., Ltd., et al. v. United States*, Slip Op. 03-169, Consol. Court No. 02-00282, dated December 18, 2003.


Page 23:      In line 13, replace "264 F. Supp. 2d at 1240" with "264 F. Supp. 2d at 1240–41".

Page 28:      In line 13, replace "included other" with "included the other".

Page 33:      In line 11, replace "27 CIT" with "26 CIT".

Page 35:      In line 5, replace "*Rhodia*, 240 F. Supp. 2d at 1254" with "*Rhodia*, 26 CIT at __, 240 F. Supp. 2d at 1254".

Page 40:      In line 21, replace "*Rhodia*, 185 F. Supp. 2d at 1357" with "*Rhodia, Inc. v. United States*, 25 CIT __, __, 185 F. Supp. 2d 1343, 1357 (2001)".

Page 42:      In line 7, replace "to" with "over".

Page 49:      In line 20, replace "mushroom" with "mushrooms".

Page 51:      In line 9, replace "The ITC" with "Commerce".  In line 10, replace "the ITC's" with "Commerce's".


December 22, 2003